BUNKER HILL AND SULLIVAN MINING AND CONCENTRATING CO., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 105227. Promulgated May 11, 1943.

*Henry D. Costigan, Esq.*, and *Henry V. Colby, Esq.*, for the petitioner.

*T. M. Mather, Esq.*, for the respondent.

OPINION.

ARNOLD, *Judge:* This proceeding involves deficiencies in income and excess profits taxes for the calendar year 1937 in the respective amounts of $315,318.72, and $7,521.96. The sole issue is whether petitioner is entitled to deduct $3,117,023 as a debt ascertained to be worthless and charged off in the taxable year, representing the unpaid balance of advances made by petitioner over a period of years to the Treadwell Yukon Co., Ltd.

Facts deemed material to the issue by both parties were set forth in a stipulation of facts. Certain other facts were agreed upon in a supplemental stipulation, some of which were objected to by petitioner and others by respondent, as being irrelevant and immaterial. The respective objections are overruled, the supplemental stipulation is received in evidence, and exceptions are reserved to the objecting parties. The facts as stipulated are adopted as our findings of fact and the pertinent portions set forth hereinafter.

Petitioner was organized in 1887 as an Oregon corporation. It was reorganized in 1924 as a Delaware corporation. Its income tax return for 1937 was filed with the collector for the first district of California.

The Alaska Treadwell Gold Mining Co. (hereinafter called Treadwell) was organized as a Minnesota corporation in 1889 and continued as such until its dissolution in February 1938; the Alaska Mexican Gold Mining Co. (hereinafter called Mexican) was organized as a Minnesota corporation in 1891 and continued as such until its dissolution in February 1938; and the Alaska United Gold Mining Co. (hereinafter called United) was organized as a West Virginia corporation in 1894 and continued as such until its dissolution in January 1938. Treadwell, Mexican and United are hereinafter referred to collectively as the Douglas Island companies.

At all times petitioner had thousands and each of the Douglas Island companies had hundreds of stockholders located throughout the United States and foreign countries. The capital stock of each of these four companies was at all times owned by substantially different and widely scattered stockholders, and there was never any unified stock ownership

or stock control of both petitioner and the Douglas Island companies by any of their respective stockholders. From 1922 until his death in 1933, F. W. Bradley, a mining engineer of international reputation, was president of these four companies, as well as of various other mining corporations. To this extent there was a common management of petitioner and the Douglas Island companies, although the stockholding interests were substantially different in each of them.

In 1919 petitioner joined with the Douglas Island companies in searching for new mining properties. It was agreed that the subsequent costs of the joint venture would be shared in the following proportions: petitioner, 50 percent; Treadwell, 30 percent; Mexican, 10 percent; and United, 10 percent. Thereafter the four companies jointly prospected various mining properties in Alaska and Canada, with the costs of the joint venture being shared in the agreed proportions. By November 1, 1921, petitioner and the Douglas Island companies had jointly acquired options covering various mining properties in Alaska and the Yukon Territory and had determined that their operations would be more satisfactorily conducted through the medium of a corporation.

At the annual meeting of petitioner's stockholders on November 28, 1921, F. W. Bradley, as president, submitted a report in which he covered the operations of the joint venture up to that time. He recommended that a new corporation with a capital of $1,500,000 or less be organized to take over the properties theretofore acquired and to conduct the work of development and exploration, and ultimately the operation, of such properties, as well as such additional properties as might thereafter be acquired. The report stated in part as follows:

It is not believed that this capitalization will prove large enough to enable the new corporation to operate properties as is now contemplated, but it is large enough for the present and as it is not desirable to overcapitalize, it is deemed expedient to organize with this limited capitalization, with a view of increasing the same as soon as the need therefor may arise. Present indications are that the capitalization will ultimately have to be at least doubled * * *.

It is proposed to so continue the operations until the entire capital stock of $1,500,000.00 has been fully paid in and the stock issued in payment therefor. Whereupon if conditions are such as to deem that course expedient, it is proposed to increase the capitalization of the new corporation to a sum not to exceed $3,000,000.00, with the understanding that the three Alaska companies shall pay into the treasury a sum equal to one-half of the amount by which the said capitalization has been increased, and the Bunker Hill and Sullivan Mining Company is to pay in a sum equal to the remaining half and that thereupon stock is to issue to the respective companies so paying at par in amounts equivalent to the amounts so paid.

Early in 1922, shortly after said report and pursuant thereto, petitioner and the Douglas Island companies organized the Treadwell Yukon Co., Ltd., hereinafter referred to as Treadwell Yukon, as an

Oregon corporation with an authorized capital of $1,500,000, represented by 1,500,000 shares of stock with a par value of $1 per share. It was reorganized in 1924 as a Delaware corporation with the same capital structure and continued as such until its dissolution in February 1938. F. W. Bradley was president of Treadwell Yukon from its organization in 1922 until his death in 1933.

Upon the organization of Treadwell Yukon, petitioner and the Douglas Island companies transferred to it at cost the various options and mining rights theretofore acquired by them pursuant to their joint venture. In exchange for such transfer Treadwell Yukon issued to them shares of its capital stock at par equal to the cost ($557,112) of said options and mining rights so transferred. Said shares were issued in proportion to their respective interests in the joint venture, viz., petitioner, 50 percent; Treadwell, 30 percent; Mexican, 10 percent; and United, 10 percent. At the same time petitioner and the Douglas Island companies agreed that as and when Treadwell Yukon required further funds for its operations they would subscribe and pay cash for additional stock at par in the same proportions until the 1,500,000 shares were outstanding. This agreement was carried out and Treadwell Yukon took over and carried on the operations previously conducted as a joint venture.

By the end of 1924 Treadwell Yukon's stock was issued and held as follows:

| Stockholder | Shares held | Percent |
|---|---|---|
| Petitioner | 749,988 | 50 |
| Treadwell | 449,992⅗₀ | 30 |
| Mexican | 149,997⅗₀ | 10 |
| United | 149,997⅗₀ | 10 |
| Directors (qualifying shares) | 25 | Nominal |
| | 1,500,000 | 100 |

After the above authorized shares were issued Treadwell Yukon issued no further shares of capital stock. In 1927 Treadwell and Mexican distributed 120,000 and 36,000 shares of Treadwell Yukon stock, respectively, to their stockholders as liquidating dividends so that the general public would hold at least 10 percent of the authorized stock, which was a prerequisite to listing Treadwell Yukon stock on the Toronto Stock Exchange. These distributions were almost the only changes in Treadwell Yukon's stockholders and stockholdings from 1924 to 1937, inclusive.

At the time Treadwell Yukon was organized it was understood by and between petitioner and the Douglas Island companies that, if and when Treadwell Yukon needed funds in excess of $1,500,000, such further funds would be supplied by petitioner and the Douglas Island companies in proportion to their respective interests in the original

authorized capital, viz., 50–30–10–10. This understanding was never carried out.

By the end of 1924 Treadwell Yukon needed further funds. Mexican and United were unable to respond proportionately, so that from and after 1924 petitioner and Treadwell each began to make cash advances [1] to Treadwell Yukon and continued so to do until April 1931. Such advances were never made proportionately and the aggregate advances made by each and the respective unpaid balances fluctuated at all times. From time to time both the aggregate advances made by Treadwell and the unpaid balance thereof were greater than petitioner's. All of these advances were given priority over the investments in Treadwell Yukon's capital stock and interest was paid on them by Treadwell Yukon. Some advances were made to Treadwell Yukon by Mexican, and one advance was made by United. From time to time Treadwell Yukon made cash repayments on account of the various advances. These repayments were all made without any corporate formalities. The period during which the advances and cash repayments were made, the aggregate amounts thereof, and the final balance prior to December 30, 1937, as to each of the companies were as follows:

| Name | Period | Aggregate advances | Aggregate repayments | Final balance |
|---|---|---|---|---|
| Petitioner | 1–10–25 4–1–31 | $8,702,000.00 | $4,926,000.00 | $3,776,000.00 |
| Treadwell | 12–31–24 4–29–31 | 3,976,432.78 | 1,940,432.78 | 2,036,000.00 |
| Mexican | 2–28–25 4–29–31 | 930,000.00 | 758,000.00 | 172,000.00 |
| United | 12–7–28 | 150,000.00 | 156,200.00 | (6,200.00) |
| Total | | 13,758,432.78 | 7,780,632.78 | 5,977,800.00 |

Beginning in October 1929, Treadwell Yukon required more funds than it was able to obtain from petitioner and the Douglas Island companies, and it obtained advances from certain other corporations and, later, from certain individuals. Between October 3, 1929, and July 5, 1933, these advances, from eight corporate and individual sources, aggregated $5,951,700. Before the end of 1937 Treadwell Yukon repaid $3,520,700 of these advances, leaving an unpaid balance of $2,431,000, all of which represented unpaid advances by the predecessor of or an assignee of the Bradley Mining Co. In October and November 1937 Treadwell Yukon made its final repayments, aggregating $200,000, on advances made by Ogden Mills, the Alaska Juneau Mining Co., and Bernard M. Baruch, totaling $750,000. Final repay-

---

[1] The stipulation carries the following statement: "The term 'advances' is used through out in this stipulation to avoid any admission by either party as to their legal character inasmuch as the pleadings in this case raise an issue as to whether or not the advances were loans creating an indebtedness."

ments on three other accounts had been made in 1934, 1932, and 1931, respectively, viz., Bernard E. Smith, Golden Gate Gold Mining Co., and Badger.Gold Mining & Milling Co. None of these corporations or individuals ever owned any shares of stock of Treadwell Yukon except in three instances where shares were obtained as a result of the aforementioned liquidating dividends in 1927. In two of these instances the stock so acquired was sold, while in the other instance the stock was retained. Generally the advances last mentioned were later in point of time and were given a preferred position over the earlier advances by petitioner and the Douglas Island companies.

All advances obtained by Treadwell Yukon, aggregating $19,710,-132.78, were used for the purpose of financing its acquisition, prospecting, development, and operation of various mining properties in which it was interested. Said advances were supplemented by the earnings obtained by Treadwell Yukon from those of its properties which were placed on an operating basis.

Prior to December 1928 petitioner's books and records carried its advances to Treadwell Yukon in two accounts captioned Treadwell Yukon Loan A/C and Treadwell Yukon Errington A/C. On December 1, 1928, petitioner transferred the advances to a new ledger book account under the caption "Notes Receivable—Treadwell Yukon Co." All further advances thereafter made by petitioner, including those represented by promissory notes, as hereinafter set forth, were entered in the new account and kept there until written off in 1937, as hereinafter set forth.

Treadwell Yukon paid interest on petitioner's advances each month to March 1931. The first interest was paid on February 21, 1925, at the rate of 6 percent. On December 30, 1929, the rate was increased to 7 percent. On May 1, 1935, the rate was reduced to 5 percent, although Treadwell Yukon paid no interest to petitioner after March 1931. Petitioner's records show that between January 1925 and March 1931 it received interest payments from Treadwell Yukon in the total amount of $670,127.74. All of said interest payments were returned by petitioner as taxable income for the respective years in which received. As of December 31, 1937, the accrued interest then due and unpaid to petitioner on account of the unpaid balance of its advances to Treadwell Yukon was $1,968,932. No portion of this accrued interest was ever included in the amount of the promissory notes given to petitioner by Treadwell Yukon or included in the bad debt deduction hereinafter mentioned. Interest was also regularly paid by Treadwell Yukon each month in cash until April 1, 1931, to each of the others from whom it had obtained advances prior to that date. For most of the period during which interest was regularly paid, Treadwell Yukon had insufficient earnings from which to make such payments and the payments

made were from any available cash funds, regardless of the sufficiency of earnings.

Petitioner's balance sheets for 1926 to 1934, inclusive, carried the unpaid advances to Treadwell Yukon as "Interest Bearing Advances." Petitioner's balance sheet for 1935 reflected a reserve set up on its books "to cover possible losses" from its unpaid advances to Treadwell Yukon. Petitioner's directors ratified, approved, and confirmed the action of its officers in setting up this reserve of $3,775,999 on its books as a debit to earned surplus, effective December 31, 1935. Petitioner's journal shows the following entries with respect to said contingent reserve:

| | |
|---|---|
| Surplus _____ | $3, 775, 999. 00 |
| To reserve against loss Treadwell Yukon Company indebtedness_____ | 3, 775, 999. 00 |

Reserve to cover possible loss on A/C Treadwell Yukon Company advances approved by board of directors March 24, 1936, effective as of December 31, 1935.

Petitioner made no changes in the ledger book entries at the time when it set up said reserve and it continued to carry the full unpaid balance of said advances in its ledger until the end of 1937. The two following items appeared in its balance sheet for 1937:

| | |
|---|---|
| Add Reserve to cover Loss on Treadwell Yukon Co., Ltd., Notes as set up in Accounts on December 31, 1935_____ | $3, 775, 999. 00 |
| Deduct Uncollectible Balance of Treadwell Yukon Co., Ltd., Note Account Written Off_____ | 3, 117, 023. 00 |

Petitioner's balance sheets for each of the years 1926 to 1937, inclusive, were included in its annual reports for such years, which were distributed to its thousands of stockholders.

Treadwell Yukon entered none of the advances received by it in any surplus account or special capital account on its books. Petititoner's advances prior to April 30, 1930, were entered by Treadwell Yukon in its ledger as an open book account in the nature of an account payable under the caption "Bunker Hill & Sullivan M. & C. Co." On April 30, 1930, the advances were transferred to a new ledger book account captioned "Bunker Hill & Sullivan M. & C. Co.—Loan Account," and all further advances thereafter received, including those represented by promissory notes, were entered therein.

In its balance sheets for the years 1926 to 1937, inclusive, Treadwell Yukon captioned the unpaid balance of petitioner's advances as "Borrowed at 6 per cent," "Borrowed at 7 per cent," "Notes Payable: (bearing 7% interest)," or as just "Notes Payable." These advances were shown as liabilities in the published annual reports of Treadwell Yukon. The amount of the unpaid advances at the end of each year was followed by the statement "Borrowed at six percent," "Borrowed at 7 percent," or "Notes Payable: (Bearing 7 percent interest)." After

1933 the annual reports showed no rate of interest but did show the accrued unpaid interest on the balances, which, by December 31, 1937, amounted to $1,968,932. All of Treadwell Yukon's annual reports were distributed to its stockholders and given publicity in financial circles.

Beginning on November 30, 1928, Treadwell Yukon gave petitioner promissory notes for a part or all of the unpaid balance of petitioner's advances. Each of said notes was payable on demand, was without interest coupons, and was not in registered form. An interest rate of 6 percent payable monthly was provided for at first, then 7 percent, payable monthly; but on May 1, 1935, a renewal demand note for $3,776,000 at 5 percent, payable annually, was given petitioner.

From the time of its organization in 1922 Treadwell Yukon was engaged in the acquisition, prospecting, development, and operation of numerous mining properties in Alaska, Canada, and the United States. The few properties which it placed on an operating basis were valuable chiefly for silver and lead. The principal properties, with dates of acquisition, in which it was interested and in which it invested the greater portion of its funds were the Errington mine in the Province of Ontario, Canada, 1925; the Tybo mine in Nevada, 1925; the Wernecke mines in Yukon Territory, 1922; and the Bussieres mine in the Province of Quebec, Canada, 1931. Treadwell Yukon invested approximately $8,000,000 in the Errington mine and approximately $1,000,000 in the Bussieres mine, neither of which passed the development stage, the former being abandoned in 1932 and the latter in 1933.

The Tybo mine was valuable chiefly for lead and silver. It was placed in production in 1929 and the commercial ore was exhausted in 1937. There was no production in 1932 and part of 1933 when silver and lead prices were very low. The net smelter proceeds for the Tybo mine from 1929 to 1937, both inclusive, aggregated $3,957,733.57. The Wernecke mines were chiefly valuable for silver. They were put on an operating basis in 1923, and from 1923 to 1937, both inclusive, the net smelter proceeds aggregated $11,515,127.04, with no production in 1935. For the three years subsequent to 1937 the "new corporation" which succeeded Treadwell Yukon, as hereinafter related, had net smelter proceeds aggregating $3,089,607.06. The net smelter proceeds of the Wernecke mines for 1937 exceeded that of any other year.

Treadwell Yukon's gross earnings from 1922 through 1937 aggregated $24,683,686, and ranged from $113,815 in 1922 to $3,337,767 in 1929. The taxable year 1937 was its second best year for the period, with gross earnings of $3,087,987. Its net profit or loss before interest was deducted for the sixteen years in this period shows profits in 1924, 1925, 1926, 1928, 1929, 1933, and 1937 aggregating $1,102,688, and losses in the other years aggregating $2,752,928. Its net profit or loss after interest (no interest was paid in 1922, 1923, or 1924)

shows losses in every year except 1925 and 1926. Its aggregate net loss after interest for the period 1922 to 1937, inclusive, was $7,291,183.

The high and low prices of Treadwell Yukon shares on the San Francisco Curb Exchange from the time in 1928 when its shares were first held by the general public through the taxable year show a high of $31.50 in 1928 and a low of $0.25 in 1935. The high and low for 1937 were $2.25 and $0.40, respectively. Trading became inactive toward the end of 1937 and the last recorded sale on November 23, 1937, was 100 shares of Treadwell Yukon at $0.50 per share. Trading in shares of the "new corporation," hereinafter described, commenced on February 11, 1938, and the average price of sales on that day was $0.55 per share.

After the death of F. W. Bradley in July 1933, Treadwell Yukon obtained no further large unsecured advances and was unable to continue further prospecting or development work. Its operations thereafter were virtually confined to its Wernecke mines and the Tybo mine until the end of 1937, when it sold and transferred all of its assets to the "new corporation," as hereinafter related.

Shortly after the death of F. W. Bradley, Bernard E. Smith sued Treadwell Yukon to recover the amount of his advances, with interest. As a result of the suit an agreement, dated December 22, 1933, was entered into between "Treadwell Yukon and its following creditors:" Alaska Juneau Gold Mining Co.; petitioner; Mexican; United; Treadwell; Bradley Mining Co.; San Francisco Commercial Co.; Estate of Ogden Mills, deceased; and Bernard M. Baruch. These creditors, "acting for the best interests of said company [Treadwell Yukon] and its creditors," agreed that Smith's loan should be settled by payment in full, together with interest and costs; that the "loans made by" Mills, Alaska Juneau, and Baruch should be considered prior claims of equal standing to be liquidated, with interest, in proportionate payments by Treadwell Yukon; and that in the meantime the creditors would forbear presenting their claims in court, the statute of limitations should be suspended as to their claims, and the company (Treadwell Yukon) "given a reasonable time to try and work out its problems and improve its ability to pay its creditors." This agreement was carried out and the advances of Smith, Mills, Baruch, and Alaska Juneau to Treadwell Yukon were fully repaid with interest.

On December 8, 1937, the Bradley Mining Co. (which had acquired the interest of the San Francisco Commercial Co. in 1936), petitioner, Treadwell, and Mexican "were the only ones whose advances to Treadwell Yukon had not by then been repaid by it in full, with interest." On said date the aforesaid parties, as parties of the first part, entered into a certain written agreement with Treadwell Yukon, as second party, pursuant to a plan of reorganization set forth in a letter sent by Treadwell Yukon to its stockholders, dated November 18, 1937.

The agreement, after reciting the "capital debt" and "interest" due each of the first parties as of December 31, 1937, including $3,776,000 "capital debt" and $1,968,932 interest due petitioner, its inability "to pay such indebtedness" (which aggregated $8,415,000 without interest), provides in part as follows:

WHEREAS, all parties hereto wish to avoid the loss and disadvantage which would result from a voluntary or involuntary liquidation of Second Party and to that end said creditors are willing, except as hereinafter set forth, to each ratably compromise and accept in full payment of the indebtedness owed to each an amount or other property in lieu thereof less than the principal amount of such indebtedness; and

WHEREAS, there has been proposed a plan hereinafter set forth and agreed to, for payment and satisfaction of such indebtedness, as ratably compromised and adjusted, in the common stock of a new corporation to be organized to take over the property and assets of Second Party;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The agreement then recites that there shall be organized a new corporation under the laws of Delaware, to be known as "Treadwell Yukon Corporation, Limited," with 2,000,000 shares of common stock, par value $1 per share; that effective at midnight December 31, 1937, Treadwell Yukon should transfer and convey to the new corporation all its property and assets "free and clear of all debts and liabilities (including the described indebtedness due from Second Party to First Parties) except moneys due for current operating expenses and $500,000 of the indebtedness due" Bradley Mining Co., which operating expenses and $500,000 indebtedness should be assumed by the new corporation; that in consideration of such transfers and conveyances the new corporation "shall issue to or for the benefit of" Treadwell Yukon 1,522,504 shares of its capital stock; that "Second Party agrees to authorize and direct the payment and deliver unto each of First Parties, who hereby severally agree to accept the same as full payment and satisfaction of the indebtedness set after the name of and now due each from Second Party, the following number of the fully paid up shares of the capital stock of said new corporation, which capital stock shall be issued by said new corporation directly to said First Parties, as follows: "

| | Indebtedness to be paid and canceled | Shares | Percentage |
| --- | --- | --- | --- |
| Bradley Mining Co | $2,778,274 | 318,684 | 20.93 |
| Petitioner | 5,744,932 | 658,977 | 43.28 |
| Treadwell | 3,007,237 | 344,948 | 22.66 |
| Mexican | 242,673 | 27,836 | 1.83 |
| Common stockholders | | 172,059 | 11.30 |

The 172,059 shares were to be distributed by the new corporation, or by such agency as Treadwell Yukon designated, to Treadwell Yukon's

shareholders on the basis of one of such new shares for each 8.718 shares of Treadwell Yukon. As stockholders, petitioner, Treadwell, Mexican, and United, and certain individuals, shared these 172,059 shares of Treadwell Yukon in the respective percentages of 50 percent, 22 percent, 7.6 percent, 10 percent, and 10.4 percent.

It was further agreed that:

For the protection of all parties, * * * the shares of said new corporation to be paid and delivered to First Parties, as aforesaid, shall be issued and delivered by said new corporation directly to First Parties upon delivery to such new corporation by First Parties for the account of Second Party of proper instruments acknowledging full payment and satisfaction of the said indebtedness due each from Second Party and the surrender of the promissory notes, properly cancelled, of Second Party now evidencing such indebtedness, excepting that the new corporation shall issue to said Bradley Mining Company a promissory note for $500,000.00 on similar terms to the note or notes cancelled and which principal sum of $500,000.00 shall be considered as a continuation of that amount of the original indebtedness now due from said Second Party.

The plan of reorganization set forth to Treadwell Yukon stockholders in the letter dated November 18, 1937, as aforementioned, included an "Expected Balance Sheet of the Re-Organized Company as at January 1, 1938" which showed current assets of $647,900, deferred charges of $355,100, and capital assets of $1,105,004, making total assets of $2,108,004, and showed current liabilities of $85,500, notes payable of $500,000, and capital stock of $1,522,504, making total liabilities of $2,108,004.

The aforesaid plan of reorganization of Treadwell Yukon was discussed by petitioner's directors at a meeting held on November 24, 1937, prior to the execution of the agreement of December 8, 1937, between Treadwell Yukon and its creditors. It was recognized that the receipt by petitioner of 658,977 shares of stock of the new corporation for the indebtedness indicated a loss which might be deductible as a bad debt, and a careful study of the situation was requested, with authority to secure competent advice and assistance.

Pursuant to the agreement of December 8, 1937, Treadwell Yukon, on December 21, 1937, organized "Treadwell Yukon Corporation, Limited," a Delaware corporation heretofore and hereinafter referred to as the "new corporation." On December 30, 1937, Treadwell Yukon sold, conveyed, and transferred all of its assets to the new corporation, effective as of midnight December 31, 1937. On the same date the new corporation issued and delivered 1,522,504 shares of its capital stock to Treadwell Yukon. At that time and thereafter these shares represented the only assets of Treadwell Yukon, and it acquired no other assets prior to its dissolution in February 1938. The new corporation did not assume any obligation to pay petitioner any portion of the unpaid balance of the advances (or accrued interest thereon) theretofore made by petitioner to Treadwell Yukon.

On December 30, 1937, after the receipt of the shares of stock of the new corporation, Treadwell Yukon distributed said shares to its stockholders and to the corporations which had advanced funds to it in accordance with the terms of the agreement of December 8, 1937. By this distribution petitioner received 745,007 shares, of which 658,977 shares were on account of the unpaid balance of its advances and 86,030 shares were on account of petitioner's stockholdings in the old corporation. At the same time petitioner canceled and surrendered to Treadwell Yukon the latter's promissory note dated May 1, 1935, for the principal amount of $3,776,000 representing the unpaid balance of petitioner's advances to Treadwell Yukon.

Under date of December 31, 1937, an entry was made in petitioner's ledger crediting $658,977 to the account recording the unpaid balance of its advances to Treadwell Yukon. This amount represented a credit of $1 per share for the 658,977 shares received by petitioner from Treadwell Yukon. As of the same date entries on petitioner's books recording the contingent reserve aforementioned were reversed, the reserve being debited with $3,775,999 and surplus credited in the same amount. Surplus was then charged with $3,117,023 ($3,776,000 minus $658,977) and "Notes Receivable, Treadwell Yukon Company" was credited in the same amount. Journal entries supporting these ledger entries appear in petitioner's books. The action of the accounting officers in charging off the unpaid balance of $3,117,023 as a worthless debt as of December 31, 1937, was ratified, confirmed, and approved by petitioner's board of directors on January 27, 1938, prior to the closing of petitioner's books.

In its income tax return for 1937 petitioner deducted $3,117,023 as a bad debt. Neither the whole nor any part of that amount has ever been paid. Petitioner has always treated bad (worthless) debts as deductible in the year the debt was ascertained to be wholly or partially worthless and not by deducting any addition to a reserve for bad debts. Petitioner's books of account were kept on the accrual basis.

In its 1933 income tax return petitioner claimed a loss of $749,988, representing its investment in Treadwell Yukon stock. The claimed loss was disallowed and petitioner's tax for 1933 was paid on the basis of such disallowance.

On their income tax returns for the years 1925 to 1931, inclusive, petitioner and the Douglas Island companies each returned as taxable income all interest paid to them by Treadwell Yukon. The aggregate tax paid by those companies for said period was $136,022.55, of which petitioner alone paid $79,679.37. Treadwell Yukon deducted said interest payments on its returns, but derived a tax savings in only two years, 1925 and 1929, totaling $5,199.45, of which $2,292.81 was attributable to petitioner alone. No portion of the taxes paid by petitioner

and the Douglas Island companies has ever been refunded or credited to them.

During the years 1932 to 1937, inclusive, petitioner did not return the unpaid and accrued interest as income to it because of Treadwell Yukon's financial condition. Respondent accepted petitioner's position in not returning the unpaid interest. Treadwell Yukon deducted such unpaid and accrued interest in determining its net income for said years, but it had a net loss even before such deduction in all years except 1933 and 1937, and the deductions for the latter years exceeded net earnings by very substantial amounts. Treadwell Yukon's tax liability for 1937 is presently in dispute, with respondent claiming that no portion of the interest accrued in 1937 was deductible.

In a consolidated return filed for 1933 the Bradley Mining Co. and San Francisco Commercial Co. claimed a deduction of $1,955,249.48 for bad debts, representing unsecured cash loans made to Treadwell Yukon. The deduction was allowed by respondent. At that time the Bradley Mining Co. was a preferred creditor of Treadwell Yukon. In its 1938 income tax return the Bradley Mining Co. reported a non-taxable profit of $186,463.83 by virtue of its receipt of the aforesaid $500,000 note plus the receipt of 318,684 shares of stock, which it valued at $0.55 per share, or a total of $675,276.20, less $488,812.37, which was the balance of its loans to Treadwell Yukon after the 1933 charge-off for bad debts. No change was made with respect thereto by the respondent's agents after examination of this transaction.

Petitioner's advances to Treadwell Yukon were loans and not capital contributions. The unpaid balance of the principal amount of Treadwell Yukon's indebtedness, namely, $3,117,023, was a debt properly ascertained to be worthless and charged off by petitioner during the taxable year 1937.

Upon the foregoing facts petitioner contends that its advances to Treadwell Yukon were loans and not capital contributions, that the indebtedness created thereby was neither worthless, ascertained to be worthless, nor charged off prior to 1937, and finally that section 112 of the Revenue Act of 1936 does not prevent the recognition of a bad debt deduction for the taxable year.

Respondent contends, first, that the advances were capital contributions; second, that if the advances were loans they were ascertained to be worthless and charged off prior to 1937; and, finally, that in any event the nature of the 1937 corporate readjustments was such that no gain or loss could be recognized (a) because of the provisions of section 112 (b) (5), or (b) because of the provisions of section 112 (b) (3), Revenue Act of 1936.

Both parties are agreed that the character of petitioner's advances, whether loans or capital contributions, depends upon an analysis of

all the facts and circumstances. Respondent advocates a realistic viewing thereof which, he says, discloses that the advances were a permanent contribution to Treadwell Yukon's capital. We have carefully weighed and considered respondent's arguments in the light of the stipulated facts. Whether viewed realistically or formally, we are convinced by the evidence herein that the advances were loans. Some of the circumstances that have influenced our determination are: Petitioner received repayments in excess of one-half of its advances; petitioner's advances were interest bearing; petitioner actually received interest over a period of years in excess of $670,000; petitioner paid income taxes on the interest received for the respective years in excess of $79,000; the corporate books, records, financial reports, correspondence, and other corporate acts of both petitioner and Treadwell Yukon consistently treated and referred to the advances as loans; and neither the advances nor the unpaid balances thereof were ever in proportion or closely proportionate to the ownership of stock in Treadwell Yukon.

We can find no support for respondent in the report of F. W. Bradley to petitioner's stockholders at their annual meeting in 1921. This report covered the joint operations of petitioner and the Douglas Island companies, recommended the incorporation of Treadwell Yukon, and stated that its proposed authorized capital of $1,500,000 might have to be at least doubled in view of the properties to be operated. Actually, no stock except that originally authorized was ever issued by Treadwell Yukon, and Bradley's optimistic statement that the future capitalization of Treadwell Yukon might have to be at least doubled was not borne out by subsequent operations. By the end of 1924 two of the Douglas Island companies were financially unable to risk further sums in developing and operating the properties, which left the burden of providing Treadwell Yukon with funds upon petitioner and Alaska Treadwell, whose advances between January 10, 1925, and April 30, 1931, exceeded $12,000,000. If we held these advances to be capital contributions, as respondent insists they should be, then the repayments, which were made without corporate formalities in excess of $6,000,000, and the interest payments, which exceeded $670,000 to petitioner alone, must have been corporate distributions of capital and income. But any such holding would be erroneous, as all stockholders did not share proportionately in the distributions and said distributions were made without proper authorization.

There is one other factor that influenced our determination of the nature of these advances, namely, the advances of almost $6,000,000 made by eight corporations and individuals between October 3, 1929, and July 5, 1933. At least five of the parties making these advances had no stock interest in Treadwell Yukon, and no question of capital contribution could be raised as to their advances. The amounts that these parties advanced must have been based upon their opinion of

Treadwell Yukon's ability to repay and/or their confidence in F. W. Bradley. Certainly they considered themselves creditors of the latter corporation; certainly they were considered creditors by the debtor corporation; and the amounts they advanced are certainly referred to as *loans* in the stipulation of facts. The agreement of December 22, 1933, between Treadwell Yukon and the various parties listed therein as "creditors," some of whom were among the eight aforementioned, made no distinction as to the character of the advances made by stockholders and nonstockholders, and said agreement made provision for the liquidation *with interest* of the *loans* made by Smith, Ogden Mills, Alaska Juneau, and Bernard Baruch. Except for the agreed preferences we can see no basic difference in the relationship that existed between petitioner and Treadwell Yukon, and between Treadwell Yukon and parties having a preference. Treadwell Yukon acknowledged the indebtedness, and we hold, therefore, that the advances were loans and not capital contributions.

Respondent's contentions on the second point are that if the advances are loans (1) they were worthless prior to the taxable year; (2) that a reasonably prudent person would have ascertained that the loans were worthless prior to 1937; and (3) that petitioner did in fact ascertain their worthlessness and charged them off prior to 1937. In support of his argument respondent points to the large net operating deficit of Treadwell Yukon over the years 1922 to 1937, inclusive; the $9,000,000 lost in the Errington and Bussieres mine ventures; the large amounts due preferred creditors, in excess of $3,000,000; Treadwell Yukon's loss of credit following the death of F. W. Bradley in 1933; the action of the San Francisco Commercial Co. and the Bradley Mining Co., two preferred creditors of Treadwell Yukon, in claiming on their consolidated return for 1933 a deduction of $1,955,249.48 representing 80 percent of their total advances, which was claimed and allowed as a bad debt for 1933; and, finally, that the entries made on petitioner's books of account as of December 31, 1935, setting up a contingent reserve of $3,775,999, were for all practical purposes an ascertainment of worthlessness and a charge-off during 1935.

Petitioner, in support of its burden of proof, urges that the frequent advances to and repayments by Treadwell Yukon prior to April 1931 would prevent any ascertainment of worthlessness during the period 1922 to 1931; that the large unsecured loans obtained by Treadwell Yukon from nonstockholders during the period 1929 to 1933 would prevent any ascertainment of worthlessness during this period; that respondent denied petitioner a loss in 1933 representing the amount of its investment in Treadwell Yukon stock; that repayments of the advances of nonstockholders were made by Treadwell Yukon during 1934, 1935, and 1937; that the creditors' moratorium agreement of December 1933 virtually prevented any ascertainment of worthlessness

by petitioner until 1937; that Treadwell Yukon's capital stock had a substantial market value at all times during the 1931–1937 period and never sold on the stock exchange for less than 25 percent of its par value; that Treadwell Yukon had substantial gross earnings and good speculative possibilities during 1931–1937; that Treadwell Yukon made a substantial final payment to petitioner in 1937 of $658,977; and that the debt was ascertained to be worthless and charged off in the taxable year.

In answer to respondent's contention that entries on petitioner's books show a charge-off as of December 31, 1935, petitioner points out that the entries set up a *contingent* reserve involving no write-off or write-down of any asset account on its books; that the explanation accompanying the entries shows on its face that there was no ascertainment of worthlessness of any part or all of the amount; and that the contingent reserve was expressly described as a reserve against *"possible loss"* and it reflected nothing more than a conservative accounting step. It is urged upon authority of *Continental Pipe Manufacturing Co.* v. *Poe* (C. C. A., 9th Cir.), 59 Fed. (2d) 694, that such reserves are not allowable as deductions and do not constitute an ascertainment of worthlessness.

After carefully weighing and considering the contentions of the parties in the light of the arguments they have pressed upon us, we have reached the conclusion that there was no ascertainment of worthlessness or charge-off of the indebtedness prior to the taxable year. Furthermore, we are convinced that the unpaid balance of said loans was ascertained to be worthless and was charged off during 1937, and, unless respondent prevails on the third point, which is hereinafter discussed, petitioner is entitled to the deduction claimed and here disputed.

While numerous facts and circumstances pertinent to the question are contained in the lengthy stipulations of fact offered and received in evidence, we shall attempt to point out only the more persuasive facts that guided us to our conclusion. One fact that stands out preeminently in our mind regarding the debtor corporation is that, although engaged during its existence in what respondent has aptly termed "a speculative undertaking" in which the capital risk was great, but with prospects of a correspondingly great return if a bonanza had been struck, nevertheless, Treadwell Yukon continued to be a going concern and had gross earnings in excess of $24,000,000. Another important factor is that men experienced in the mining industry and the financial world believed in the potential and speculative values of Treadwell Yukon's properties and backed their judgment with cash advances in excess of $19,000,000.

The significance of the above facts is not to be lightly brushed aside in determining the question of when the unpaid balance of petitioner's

advances became worthless. Granted that the debtor was unable to obtain additional unsecured loans after the death of F. W. Bradley in 1933, the unalterable facts remain that it continued to have substantial gross earnings each year thereafter, it continued to pay off its preferred creditors, and its net profit before interest in 1937 was the largest in the company's existence. Prior to Bradley's death the debtor obtained large unsecured loans first from its own stockholders and thereafter from nonstockholders. During these years when Treadwell Yukon was borrowing and repaying millions of dollars together with hundreds of thousands of dollars of interest, it would be impossible to say that a final payment on petitioner's advances had been made and that the unpaid balance should be considered worthless. Indeed, we do not understand respondent to be here contending that the unpaid balance was ascertained to be worthless or charged off prior to 1935.

Respondent submits, however, that for all practical purposes petitioner ascertained the worthlessness of its unpaid balance and charged off the same by the action of its officers and directors in closing its books for 1935. As of the end of that year petitioner set up a contingent reserve which was explained on its books as a reserve "to cover possible loss" because of the Treadwell Yukon indebtedness. Respondent's argument ignores the explanation of the journal entries on petitioner's books, the fact that its ledger account with respect to the unpaid advances continued unchanged until the end of the taxable year, and the rule that reserves to cover contingent liabilities are not deductible, *Lucas* v. *American Code Co.*, 280 U. S. 445; *Continental Pipe Manufacturing Co.* v. *Poe*, *supra*. While the reserve set up by petitioner was not a reserve to cover contingent liabilities, it was a contingent reserve, and, by a parity of reasoning, the deduction of such a reserve should be denied, if claimed, because the statute requires an ascertainment of worthlessness and a charge-off of the debt as a prerequisite to the deduction. This taxpayer neither wrote off nor wrote down the asset account on its books; it merely transferred a part of its surplus to a reserve account for the reason that "the outlook for the Treadwell Yukon Company, Ltd. at this time is not promising because of low metal prices and its limited operations and it is possible that part or all of its indebtedness to this Company may never be repaid." We are unable to find in such language or in the actions of the petitioner's officers or directors that *ascertainment of worthlessness* or *charge-off*, which the statute requires.

By contrast the journal entries in petitioner's books of account at the end of the taxable year and the resolutions of its board of directors with respect thereto specifically and definitely set forth the ascertainment of worthlessness and the charge-off of the unpaid balance of

the Treadwell Yukon account. After crediting Treadwell Yukon with a final payment on account of $658,977, which was the value assigned by petitioner to 658,977 shares of stock of the new corporation received as final payment, petitioner fixed the amount of the debt ascertained to be worthless and charged off as $3,117,023. We agree with petitioner that the debt was not ascertained to be worthless or charged off prior to 1937, but that such ascertainment and charge-off occurred during the taxable year.

The final question is whether section 112 (b) (5) or section 112 (b) (3) of the Revenue Act of 1936 prevents the recognition of the bad debt deduction which we have held is otherwise allowable. Section 112 deals with the recognition of gain or loss and the general rule, stated in subsection (a) thereof, provides that "Upon the sale or exchange of property the entire amount of the gain or loss, * * * shall be recognized, except as hereinafter provided in this section." Subsection (b) deals with "Exchanges Solely in Kind," and subdivision (3) and subdivision (5) thereof, the latter as amended by section 213 of the Revenue Act of 1939, are set forth in the margin.[2] The last sentence quoted in subdivision (5) is the pertinent portion of the amendment made by section 213 (h) of the Revenue Act of 1939.

We first consider whether subsection 112 (b) (5) applies so as to prohibit the recognition of any gain or loss. Briefly, the plan of reorganization submitted to and accepted by the stockholders of the debtor corporation provided for the waiving of priorities, except as to $500,000 of the preferred creditor's advances, and the placing of the remaining indebtedness, including accrued interest, upon a dollar for dollar parity with the investment by stockholders, so that each participant, creditor or stockholder, would receive a proportionate interest in the stock of the newly organized corporation, which would acquire the assets of the debtor corporation free and clear of debt except for the $500,000 aforesaid and current operating expenses. Mathematically

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \* \*

(b) (3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, *exchanged* solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\* \* \* \* \* \* \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in *exchange* for stock or securities in such corporation, and immediately after the *exchange* such person or persons are in control of the corporation; but in the case of an *exchange* by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the *exchange*. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under section 213 of the Revenue Act of 1939 it is not considered as "other property or money") shall be considered as stock or securities received by such transferor. \* \* \*
[Emphasis supplied.]

this meant that creditors of the debtor, including nonstockholders, would receive 88.70 percent of the issued stock of the new corporation and the stockholders of the debtor, including noncreditors, would receive 11.30 percent thereof. The agreement of December 8, 1937, provided that the new corporation's stock should be issued to or for the benefit of Treadwell Yukon directly to the creditors in the agreed amounts upon delivery by the creditors to the new corporation of proper instruments acknowledging full payment and satisfaction of the indebtedness and surrender of the promissory notes, properly canceled. The mechanics actually followed were that the stock of the new corporation was issued directly to the debtor corporation, in exchange for its assets, and thereafter the debtor corporation distributed the shares to its stockholders and creditors in accordance with the plan submitted to and accepted by its stockholders.

Respondent contends that section 112 (b) (5) prohibits the recognition of any loss from this transaction under the rationale of the Supreme Court's decision in *Helvering* v. *Cement Investors, Inc.*, 316 U. S. 527. Specifically, he argues that petitioner and the other creditors transferred their equitable, proprietary interests in Treadwell Yukon's assets to the new corporation solely in exchange for common stock of said corporation and the assumption of the $500,000 indebtedness. He urges that there can be no question but that these property holders received such stock in proportion to their interests in the equity transferred and were in control of the new corporation after the transfer. As additional support for the application of section 112 (b) (5) respondent cites *Miller & Paine*, 42 B. T. A. 586; petition to review dismissed, 133 Fed. (2d) 204, and *Leslie H. Reed*, 45 B. T. A. 1130; affd., 129 Fed. (2d) 908.

In the *Cement Investors* case, *supra*, the taxpayers owned first mortgage bonds of a subsidiary company guaranteed by the parent. After default on the bonds petitions for parent and subsidiary were filed under section 77B of the Bankruptcy Act. A reorganization plan was formulated by committees for the security holders which was approved by the court. The plan provided for a newly organized corporation to which all assets of the debtor companies would be transferred, the new company to assume the obligations of the bonds of the parent and issue income bonds and common stock in exchange for the bonds of the subsidiary company. The stockholders of the debtor companies would receive no interest in the new company, but in exchange for their stock would receive warrants for the purchase of shares of stock of the new company. The plan was consummated and the taxpayers exchanged their bonds for income bonds and stock of the new company. The fair market value of the new securities exceeded the basis of the old and the Commissioner determined deficiencies based on the gain which he recognized. The Board, the Circuit

Court of Appeals, and the Supreme Court agreed with the taxpayer that section 112 (b) (5) of the Revenue Act of 1936 was applicable, thereby prohibiting the recognition of any gain.

Petitioner presents three reasons why the rationale of the *Cement Investors* case, *supra*, is inapplicable here: First, it transferred no property to the new corporation; second, if it can be said that petitioner became the owner of an equitable interest in the debtor corporation's assets, and hence a transferor to the new corporation, then petitioner's receipt of such equitable interest constituted a final payment on the debt and entitled petitioner to deduct the remainder as a bad debt; and, finally, if petitioner, the other creditors, and the stockholders are to be regarded as the transferors of the debtor's properties, nevertheless the amount of stock received by each in the new corporation was not substantially in proportion to the interests held in the properties prior to the transfer.

Examining these reasons in the order presented, we have little difficulty in agreeing with petitioner on the first point made. It is stipulated that "Treadwell Yukon sold, conveyed and transferred all of its assets to the new corporation" on December 30, 1937, effective as of midnight December 31, 1937. Prior thereto there had been no division or distribution of the debtor's assets among its creditors or its stockholders. In the absence thereof we cannot see how it could be said that the creditors or stockholders transferred the assets to the new corporation or that Treadwell Yukon acted as agent or trustee for either group in so doing. In our opinion it acted for itself, as the parties have stipulated. Until a court of equity intervenes stockholders and creditors of a corporation are not the owners of the corporate assets, notwithstanding the insolvency of the corporation. *Hollins* v. *Brierfield Coal & Iron Co.*, 150 U. S. 371, 382, 383. In the *Cement Investors* case, *supra*, the Court specifically pointed out that ownership of the equity in the debtor companies effectively passed to the creditors when the processes of law were invoked to enforce their rights of full priority and at least as early as when the creditors instituted section 77B proceedings under the Bankruptcy Act whereby they excluded the stockholders. It can not be said that the voluntary compromise entered into by petitioner's creditors on December 8, 1937, excluded the stockholders and passed the ownership of the equity in the debtor corporation to the creditors, enabling them to enforce their rights of full priority, as was the effect of the court order in *Cement Investors*, *supra*.

A brief reference to the plan of reorganization will show that the creditors did not attempt to enforce their full priorities. If priorities had been enforced the Bradley Mining Co., as a preferred creditor, would have been entitled to first consideration. Instead, it agreed to and did take slightly more than 20 percent of the stock of the new

corporation, or 318,684 shares, plus a $500,000 note in full payment and satisfaction of an indebtedness of $3,278,274. Petitioner, as a general creditor, would have been entitled to priority over the stockholders, but it accepted 658,977 shares of stock, or slightly more than 43 percent of the stock of the new corporation, in full payment and satisfaction of an indebtedness of $5,744,932. The other general creditors accepted proportionate amounts in satisfaction of their advances. Thus the preferred and general creditors received approximately 89 percent of the stock of the new corporation and the stockholders of the debtor corporation received approximately 11 percent of the stock of the new corporation. Therefore, it is clear that the stockholders of the debtor company were not excluded here as they were in *Cement Investors, supra,* and the other cases involving 77B proceedings.

Petitioner's second reason assumes that under the ageement of December 8, 1937, it received an equitable title or interest in the debtor's assets which it later transferred to the new corporation. It is urged that the receipt of such an interest would be no different from any other voluntary or involutary transfer by a debtor of its assets in partial or final satisfaction of an indebtedness whereby worthlessness of the indebtedness in excess of the value of the equitable interest acquired would be ascertained. In view of our holding that the assets of Treadwell Yukon passed directly from it to the new corporation and not through the creditors as equitable owners, and as petitioner's third reason is much better founded in fact and law, we deem it unnecessary to discuss the reason here advanced.

The third reason urged by petitioner against the applicability of the rationale of the *Cement Investors'* decision and section 112 (b) (5) is, assuming *arguendo* that petitioner, the other creditors, and the stockholders are the transferors of the debtor's assets, nevertheless, the amount of stock received by each in the new corporation was not substantially in proportion to its interest in the properties prior to the transfer. Our findings show that the Bradley Mining Co. received only 20.93 percent of the stock of the new corporation despite the priority it enjoyed in the debtor's assets as the only preferred creditor. Likewise, the general creditors were entitled to priority over the stockholders; and yet the claims of creditors, although greatly in excess of assets, were fully discharged by 89 percent of the entire "equitable interest," despite the fact that their claims against the debtor were more than seven times the amount of capital invested by the stockholders. Manifestly, the proportionate interests of creditors and stockholders were drastically shuffled in order to place 11 percent of the stock of the new corporation in the hands of stockholders of Treadwell Yukon *qua* stockholders. No comparable situation existed in the *Cement Investors* case, *supra*, because that case involved no dispute about the income bonds and stock not being sub-

stantially proportionate to the bondholder's interest in the debtor's assets prior to the exchange. Since section 112 (b) (5) clearly requires that each person shall have a substantially proportionate interest in the properties before and after the exchange as a prerequisite to its application, we are of the opinion that said section can not be applied to the present transaction.

*Miller & Paine, supra,* and *Leslie H. Reed, supra,* relied on by the respondent, are distinguishable factually from the instant proceeding. In both cases the taxpayer and other creditors transferred their notes directly or indirectly to the debtor's assignee and received in exchange therefor stock of the assignee in proportion to their interests in the debtor corporation. Furthermore, the appellate court in the *Reed* case stated that the record did not disclose any ascertainment of worthlessness prior to acquisition of the stock, whereas here the petitioner's records show such an ascertainment at or about the time of the creditors' agreement.

*John Wanamaker Philadelphia,* 1 T. C. 937, involved a reorganization under section 77B of the National Bankruptcy Act. The proceedings under 77B eliminated the rights of stockholders, thus making the creditors the equitable owners of the assets of the debtor corporation and their interests in the new corporation, after the exchange of their bonds for bonds and stock, were substantially proportionate to their interests in the debtor corporation prior to the exchange. These facts brought the case within the nonrecognition provisions of section 112 (b) (5) of the Revenue Act of 1936, and a bad debt deduction was disallowed. Here there were no 77B proceedings; the rights of the stockholders were not eliminated; and the transfer of the assets of the debtor corporation to the new corporation was not by the creditors as equitable owners, but by the debtor corporation. Here there was no exchange of the note for stock, but payment and satisfaction of the note by the debtor to the extent its assets permitted under an agreement whereby the creditors of the debtor corporation were to have a portion of the stock received by the debtor from the new corporation in satisfaction of their claims and the stockholders were to have the remaining portion of the stock in exchange for their stock of the debtor corporation. Moreover the interest of the creditors in the new corporation was not substantially proportionate to their interest in the debtor corporation prior to the transfer.

The sole remaining dispute is whether section 112 (b) (3) prohibits the recognition of the bad debt deduction claimed by petitioner under section 23 (k). Respondent falls back upon this section in the event that we deny the applicability of section 112 (b) (5). It is his contention that section 112 (b) (3), by its very words, contemplates a reorganization with the exchange of notes or bonds *with the debtor* in return for new notes or bonds of "such" corporation or "another" cor-

poration. Respondent cites and relies upon *Edith M. Greenwood*, 41 B. T. A. 664, where, in a recapitalization, taxpayer exchanged bonds of the debtor corporation for bonds of a lesser value of the same corporation. We applied section 112 (b) (3) and denied a deduction for partial worthlessness under section 23 (k) of the Revenue Act of 1934. Respondent also relies upon *Daniel MacDougald*, 44 B. T. A. 1046; *Miller & Paine, supra; Leslie H. Reed, supra;* and *Louis E. Stoddard, Jr.*, 47 B. T. A. 584 (on appeal C. C. A., 2d Cir.), which followed our decision in *Edith M. Greenwood, supra.*

Petitioner contends that under section 112 (b) (3) there must be (1) an exchange, (2) an exchange of stock or securities for stock or securities, and (3) a reorganization. On brief petitioner states that "under the present state of the authorities, we are not disposed to deny the probability that in the present case there was a reorganization." The authorities referred to are *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179; *Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185; and *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194. A consideration of these cases in the light of section 112 (g) (1) of the Revenue Act of 1936 and the present facts led petitioner to the above concession. But, even admitting that there probably was a reorganization, petitioner nevertheless insists that section 112 (b) (3) does not apply because (1) the demand note was not a security within the meaning of said section, (2) the demand note was not exchanged for stock but was canceled by a settlement made directly with the debtor, and (3) the worthless portion of the debt was ascertained before the note was canceled and surrendered to the debtor.

Petitioner relies particularly upon our recent decision in *Sisto Financial Corporation*, 47 B. T. A. 425 (on appeal, C. C. A., 2d Cir.), as "conclusive" authority against the application of section 112 (b) (3). In that case the taxpayer owned demand and secured promissory notes, due in six months or less, of a corporation in which it was a heavy stockholder and in fact controlled. In accordance with the specific conditions of an offer and acceptance to which the taxpayer agreed, the maker of the notes on August 31, 1936, transferred all its assets and business, free of liability on the notes held by the taxpayer, to another corporation for all of the latter's issued and outstanding common stock, par value $1 per share. The maker of the notes then distributed the shares so acquired to its stockholders and creditors, the taxpayer receiving 159,899 shares in consideration of its waiving its mortgage and claim against the debtor totaling $242,389 and consenting to the sale and transfer of the assets of the debtor to the other corporation. Other shares of the new corporation were distributed to the taxpayer by the debtor as a result of taxpayer's stock ownership in the debtor corporation. In September 1936 the taxpayer sold or conveyed 32,879 shares out of the 159,899 received

in satisfaction of the debtor's notes, 29,000 shares at $3\frac{1}{8}$, 2,379 at 4, and 1,000 at 1, which was below cost and the fair market price, but was to compensate for valuable services rendered the taxpayer and 500 shares conveyed in compensation for services rendered. In its return for 1936 taxpayer computed the cost basis of each share acquired for notes as $1.516 $\frac{(242,389)}{(159,899)}$, and reported the gain on each of the transactions aforementioned as capital gain, except the sale of 1,000 shares at 1, on which it reported a loss of the difference between cost and the selling price. Taxpayer treated the transaction in which it received the 159,899 shares of stock in satisfaction of its notes as an exchange of securities for stock in a nontaxable reorganization under section 112 (b) (3) of the Revenue Act of 1936. Respondent determined that the stock was received in a taxable exchange of property (notes for stock) under section 112 (a), valued the stock at $3 per share, and computed taxpayer's gains on the later dispositions of 32,879 shares accordingly. He determined a gain on the exchange itself of $237,308. The Board held that the demand and short term notes were not "securities" within the meaning of section 112 (b) (3), that the notes owned by taxpayer were evidences only of current financing for operating expenses, that the loans evidenced by the notes gave petitioner no proprietary interest in the debtor, and that such notes merely made taxpayer a creditor. Respondent's argument that satisfaction of the notes with stock constituted an exchange under 112 (a) but not under 112 (b) (3) was rejected, and it was held that the transfer of the stock by the debtor to the taxpayer was simply a payment by the debtor of its own debts. It was pointed out that the debtor received nothing, that it simply sold the stock to the taxpayer for an amount equal to the indebtedness satisfied, and that the taxpayer purchased the stock at a price equal to the amount evidenced by the notes due it from the seller. The Board approved the cost per share as computed by the taxpayer, $1.516, but held that all gains realized on shares thereafter sold or conveyed were taxable since the stock had been held for less than a year.

The above detailed review of the *Sisto* decision demonstrates the factual similiarity between that case and the one here being considered. We believe the reasons there given and the authorities there considered with respect to section 112 (b) (3) are equally pertinent here. There the respondent occupied the same position as to section 112 (b) (3) that this petitioner now occupies. There, we agreed with respondent that the transaction was outside the scope of section 112 (b) (3), but we disagreed with him on the applicability of section 112 (a). We are of the opinion that here too the transaction is outside the scope of section 112 (b) (3), and no contention is here made by respondent that section 112 (a) applies. Furthermore we are here

convinced that the transaction whereby Treadwell Yukon transferred the stock of the new corporation to petitioner in satisfaction of its indebtedness was simply a payment by the debtor of its own debts. Treadwell Yukon received nothing, *Hale* v. *Helvering*, 85 Fed. (2d) 819; *Bingham* v. *Commissioner*, 105 Fed. (2d) 971; *Commissioner* v. *Spreckels*, 120 Fed. (2d) 517; it merely extinguished its obligations by a distribution of its assets, ceased the transaction of business, and was thereafter dissolved. Cf. *Glenn* v. *Courier-Journal Job Printing Co.*, 127 Fed. (2d) 820.

The stipulated facts clearly establish that petitioner ascertained the partial worthlessness of the Treadwell Yukon indebtedness prior to the receipt of payment. Petitioner received notice of the proposed plan of reorganization contained in the letter of November 18, 1937, to stockholders of Treadwell Yukon. On November 24, 1937, petitioner's directors discussed the proposed plan of reorganization of its debtor, the indicated loss on its Treadwell Yukon note, and whether such loss could properly be deducted as a bad debt. Therefore, when petitioner executed the agreement of December 8, 1937, with Treadwell Yukon and the other creditors, it knew and had already ascertained that the major portion of the Treadwell Yukon note was worthless and that only a partial recovery thereon could be expected. By the agreement of December 8, 1937, petitioner, as creditor, agreed to the transfer of Treadwell Yukon's assets to the new corporation free of liability on the note held by it, and also agreed to accept 658,977 shares of the new corporation's stock in full payment and satisfaction of the note. At that time petitioner knew that the value of the property with which the indebtedness would be paid was substantially less than the amount of the indebtedness, as the property had a par and book value of one dollar per share, and that the amount of stock to be issued and outstanding would be only slightly larger than the issued shares of Treadwell Yukon, 100 shares of which had sold on the stock exchange on November 23, 1937, for $0.50 per share. By executing the creditor's agreement with Treadwell Yukon on December 8, 1937, petitioner evidenced its ascertainment of worthlessness of part of the loan prior to receipt of payment. *Charles B. Bohn*, 43 B. T. A. 953; petition for review dismissed March 3, 1942. The stockholders' approval of the creditors' agreement on December 10, 1937, and the directors' ratification of the charge-off of the unpaid portion of the debt corroborates the ascertainment of worthlessness.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

BLACK, *J.*, concurring: I concur in the result reached by the majority opinion in this proceeding, but I do not concur in some of the reasoning used therein.

I concur in the holding that the $3,776,000 claim for advances which petitioner held against Treadwell Yukon at the time of the reorganization which took place represented a bona fide indebtedness of Treadwell Yukon. I agree also that petitioner had not ascertained any part of this indebtedness to be worthless in any year prior to 1937.

It also seems plain to me that when petitioner exchanged its $3,776,000 of indebtedness against Treadwell Yukon for 658,977 shares of stock in the new Delaware corporation in the reorganization which took place, petitioner suffered a loss of the $3,117,023 which it claims. That loss is deductible either as a bad debt deduction under the provisions of section 23 (k) of the Revenue Act of 1936, or as a corporation loss under section 23 (f) of the same act, unless such bad debt deduction or corporation loss deduction is prohibited by some one or more of the nonrecognition provisions of section 112 of the Revenue Act of 1936.

An examination of section 112 shows that the only two nonrecognition provisions of that section which could possibly have any application would be section 112 (b) (3) and section 112 (b) (5). The majority opinion holds that section 112 (b) (3) has no application and gives three reasons for so holding as follows: (1) Petitioner's demand note against Treadwell Yukon was not a security within the meaning of section 112 (b) (3); (2) petitioner's demand note was not exchanged for stock but was canceled by a settlement made directly with the debtor; (3) the worthless portion of the debt was ascertained separately and independently before the note was canceled and surrendered to the debtor. The two latter reasons I think are not correct and I do not wish to appear as concurring in their soundness.

But under our decision in *Sisto Financial Corporation*, 47 B. T. A. 425 (now on review, C. C. A., 2d Cir.), a case cited in the majority opinion, the majority opinion's reason (1), above stated, is well taken. Petitioner's demand note against Treadwell Yukon was not a "security" within the meaning of section 112 (b) (3). Therefore, section 112 (b) (3) does not apply so far as it concerns petitioner's exchange of its $3,776,000 debt against Treadwell Yukon for 658,977 shares of the stock of the new Delaware corporation. I think, however, that section does apply to the exchange by petitioner of the shares of stock which it owned in Treadwell Yukon for new shares in the Delaware corporation on the basis of one share in the new corporation for 8.718 shares in the old corporation. We do not have that part of the transaction before us and any further discussion of it would be unprofitable. Both parties seem to concede that that part of the transaction was a nontaxable exchange in a reorganization.

Now, it appearing that under our decision in *Sisto Financial Corporation, supra,* section 112 (b) (3) is not applicable to petitioner's exchange of its $3,776,000 debt against Treadwell Yukon for 658,977

shares of stock in the new Delaware corporation, we turn to section 112 (b) (5) to see whether or not that provision is applicable and thus prevents the recognition of petitioner's loss on the transaction. As the Supreme Court pointed out in *Helvering* v. *Cement Investors, Inc.*, 316 U. S. 527, the two above named provisions overlap in some respects.

Petitioner in its brief urges three reasons why section 112 (b) (5) has no application, namely, (1) petitioner transferred no property to the new corporation; (2) if it can be said that petitioner became the owner of an equitable interest in the debtor corporation's assets and hence a transferor to the new corporation, then petitioner's receipt of such equitable interest constituted a final payment on the debt and entitled petitioner to deduct the remainder as a bad debt; and (3), finally, if petitioner, the other creditors, and the stockholders are to be regarded as the transferors of the debtor's properties, nevertheless the amount of stock received by each in the new corporation was not substantially in proportion to the interests held in the properties prior to the transfer.

Petitioner's grounds (1) and (2) stated above as reasons why section 112 (b) (5) does not apply are substantially the same arguments as were made by the taxpayer in *Miller & Paine*, 42 B. T. A. 586 (petition for review dismissed in the Eighth Circuit Dec. 18, 1942), and were rejected. In that case we rejected the argument that, where a creditor of an insolvent corporation exchanges his debt for stock in a newly organized corporation to carry on the business of the old corporation and thus maintain his continuing interest, it constitutes a mere payment of a debt by the debtor to the creditor and is to be treated in the same manner as such cases as *Hale* v. *Helvering*, 85 Fed. (2d) 819, affirming 32 B. T. A. 356; *James R. Stewart*, 39 B. T. A. 87; and *Charles B. Bohn*, 43 B. T. A. 953. We pointed out why we thought such cases were not applicable and we held that such a transaction, similar to the one we have here in the instant case, was not to be treated as a mere payment of a debt by a debtor to a creditor but was to be treated as an exchange coming within the framework of section 112 (b) (5), and that that section was applicable provided that the stock which all the transferors received in the new corporation was substantially in proportion to the value of the interests which they each owned in the property at the time it was transferred to the new corporation. In the *Miller & Paine* case we further held that under the evidence which was before us we could not say that the interests in the new corporation which the parties received were not substantially in the same proportion as the interests which they transferred. We, therefore, held that section 112 (b) (5) was applicable and prevented any recognition of the loss which the taxpayer was claiming.

The only real substantial distinction that I see in the facts of the instant case from those present in the *Miller & Paine* case is that the proportional interests which the parties received in the new corporation do not appear to be in substantial proportion to the interests which they gave up. That, of course, is a vital distinction and is one of the main reasons which the majority opinion uses in support of its conclusion that section 112 (b) (5) does not apply. While I do not think the facts in evidence on that point are as clear as they might be, I accept the conclusion of the majority opinion on that point.

It is unnecessary, of course, to restate in this concurring opinion the facts upon which the majority opinion relies for reaching the conclusion that the interests received were not substantially proportional. . These facts are stated in some detail in the majority opinion. I simply want to point out that is the only distinction which I see in the present case from *Miller & Paine, supra*, and it is on that basis alone that I concur in the result reached by the majority opinion.

MELLOTT, *J.*, concurs in the above.

———

HILL, *J.*, dissenting: At December 8, 1937, all the creditors of Treadwell Yukon had been paid in full except petitioner, Treadwell, Mexican, and the Bradley Mining Co. At that time the aggregate indebtedness owing to these creditors was $8,415,000, without interest. Including interest, the indebtedness aggregated approximately $12,000,000. The indebtedness to petitioner was $3,776,000 principal plus $1,968,932 of accrued interest. Also, on that date it appears that the total value of Treadwell Yukon's assets did not exceed $2,108,004. It was admittedly insolvent. Under date of November 18, 1937, Treadwell Yukon sent to its stockholders a plan of reorganization. On December 8, 1937, the creditors named above, all of whom except the Bradley Mining Co. were also stockholders, entered into a written agreement with Treadwell Yukon accepting such plan of reorganization. The basic reason for the reorganization, as stated in the plan therefor and the agreement accepting and adopting the plan, was Treadwell Yukon's inability to pay its indebtedness. The insolvency of Treadwell Yukon was not only obvious from the evidence in the record, but its inability to pay its debts was a stipulated fact in the written agreement.

That the sole reason for such reorganization was the insolvency of Treadwell Yukon is manifested by the following paragraph of the preamble to the reorganization agreement:

WHEREAS, all parties hereto wish to avoid the loss and disadvantage which would result from a voluntary or involuntary liquidation of Second Party and to that end said creditors are willing, except as hereinafter set forth, to each

ratably compromise and accept in full payment of the indebtedness owed to each an amount or other property in lieu thereof less than the principal amount of such indebtedness; * * *

Since Treadwell Yukon and all parties having a beneficial interest in its assets, namely, the creditors, were in agreement as to the plan of reorganization, they were in a position to carry out such plan without resort to court procedure.

Where the fact of insolvency conclusively appears from the evidence and is also stipulated by all parties concerned, as in this proceeding, and because of such insolvency a voluntary corporate reorganization follows to avoid loss and other disadvantageous consequences by liquidation through bankruptcy or other insolvency proceedings, the fact of insolvency thus established is, in my opinion, effective to step up the creditors to the status of stockholders.

In such situation only the creditors had a beneficial interest in the corporate assets, the equity of the stockholders having become non-existent. The creditors' interest was therefore a proprietary interest, the continuity of which was carried into the new corporation. The principle upon which statutory reorganization was held to have been effected in *Commissioner* v. *Kitselman*, 89 Fed. (2d) 458; *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179; and *Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185, is, in my opinion, applicable to the facts here to effect a statutory reorganization in respect of the proprietary interests of the creditors of Treadwell Yukon.

Under the plan of reorganization all of the assets of Treadwell Yukon were conveyed to the new corporation in exchange for 1,522,504 shares of the latter's capital stock at the par value of $1 per share. The fact that about 11 percent of this stock was distributed to the stockholders of Treadwell Yukon instead of all of such stock being distributed to the latter's creditors was either a matter of grace on the part of the creditors or was a compensating consideration to the stockholder-creditors in the compromise arrangement whereby the Bradley Mining Co.'s debt was given priority to the extent of $500,000, to be paid by the new corporation in addition to the distribution to the Bradley Co. of stock in the new corporation. In this connection it will be borne in mind that all of the creditors of Treadwell Yukon except the Bradley Mining Co. were also the majority stockholders of that company. But, regardless of the reason for the distribution of a small percentage of the new corporation's stock to the stockholders of Treadwell Yukon, the fact remains that the creditors were the owners of the proprietary interests in Treadwell Yukon's assets to the exclusion of the latter's stockholders.

Hence, it is my opinion that there was a statutory reorganization, in which the continuity of interest from the old to the new corporation

was the proprietary interests of Treadwell Yukon's creditors rather than, and not in addition to, the interests of Treadwell Yukon's stockholders.

Assuming that there was a statutory reorganization on the basis above indicated, it appears to me evident that when Treadwell Yukon's creditors' claims were stepped up to proprietary interests by reason of Treadwell Yukon's insolvency, such claims acquired the status of securities or stock since they constituted proprietary interests which were the equivalent of interests represented by certificates of stock. Therefore, when, under the plan of reorganization, such creditors' claims were exchanged for stock in the new corporation, there was in legal effect an exchange of stock or securities by such creditors for stock in the new corporation within the meaning of section 112 (b) (3), with the result that gain or loss to the creditors under such exchange can not be recognized.

It appears from the record that petitioner's entire debt, both principal and interest, was satisfied in consideration of the stock received by it under the plan of reorganization and that its proportionate amount of the stock of the new corporation was determined partly on the basis of its entire debt and partly on the basis of stock held in Treadwell Yukon. Simultaneously petitioner charged off part of the debt as worthless and claims a deduction therefor.

Clearly, petitioner is here seeking to participate in a statutory reorganization under the provisions of a statute which denies to it for tax purposes the recognition of loss sustained and at the same time is seeking the benefit of a deduction for tax purposes under another statute which would be available to it only under circumstances dissociated from a statutory reorganization involving the application of section 112 (b) (3).

Accordingly, it is my opinion that the deduction for bad debt sought by petitioner should be disallowed and that respondent's determination of deficiency should be approved.

Furthermore, if it should be held that petitioner is not debarred from claiming a deduction for bad debt, provided the evidence established the amount thereof, it has not, in my opinion, met the burden of proof as to the amount of such deduction. By a compromise arrangement in which petitioner participated in the adjustment of the interests of all parties concerned in respect of their relationship as creditors and stockholders of Treadwell Yukon, petitioner accepted a settlement of its debt for a consideration less than the proportionate amount of Treadwell Yukon's total assets ratably allocable as a payment on such debt. Hence, even if by such arrangement petitioner did not foreclose its right to a deduction for partial worthlessness of the debt by accepting in satisfaction thereof the considerations both

express and implicit in the reorganization plan compromise, it does not appear from the record what proportion of such debt would have remained uncollectible had all of Treadwell Yukon's assets been subjected to the payment of its debts.

For this additional reason it is my view that petitioner's claim of deduction herein should not be approved.

DISNEY and HARRON, *JJ.*, agree with this dissent.