MILLICENT TURLE ROELKER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81230.   Promulgated May 24, 1939.

*Alfred Roelker*, *Esq.*, for the petitioner.
*D. D. Smith*, *Esq.*, and *L. H. Rushbrook*, *Esq.*, for the respondent.

## OPINION.

DISNEY: In his determination of the deficiency the respondent found that the petitioner exchanged 3,090 shares of stock, consisting of two blocks of 1,545 shares each, acquired at different times, for 1,946.7 shares of stock in the same corporation of the value of $42,-

340.73, or $21.75 per share, and a cash dividend of $8 per share on 3,090 shares, a total of $24,720, pursuant to a plan of reorganization under section 112 (c) (1) of the Revenue Act of 1928. He allocated one-half of the value of the stock and cash received to each block of stock, and determining that petitioner had a basis of $14,420 for the first block and of $41,200 for the second block, determined that petitioner realized capital gain of $19,110.37 (limited to cash of $12,360 received) on the first block acquired and a capital loss of $7,669.63 on the second block. Of the capital taxable gain of $12,360 on the first block of stock the respondent determined that $3,285.44, or $2.1265 per share on 1,545 shares, was taxable as a dividend under the provisions of section 112 (c). The loss was not recognized because of the provisions of section 112 (e).

The petitioner argues that she received a return of capital in a partial liquidation of the Bank under section 115 (h),[1] in an amount less than her investment, thereby merely reducing the basis for her stock under section 115 (c). She regards her stock as having a single basis of $55,620. She also contends that the stock received had a fair market value of $17.50 per share and that no part of the cash received is taxable as a dividend.

The petitioner admits that there was a merger of Straus and the Bank within the meaning of section 112 (i) (1) (A) but expresses a doubt whether the acquisition by the Bank of the business of the International Trust Co. also resulted in a reorganization under the same provisions of the statute. We hold that International participated in a reorganization. There is nothing of record that the Bank did not acquire substantially all the properties of the International Trust Co. In each case the transferor acquired a definite and substantial interest in the transferee. Such transactions are within subdivision (A). *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378; *Nelson Co.* v. *Helvering*, 296 U. S. 374. The reduction of the capital stock in the Bank was a recapitalization under section 112 (i) (1) (C). *R. D. Walker*, 34 B. T. A. 983; *H. Y. McCord*, 31 B. T. A. 342.

Petitioner argues, however, that reorganization does not affect her position, for the reason that she exchanged nothing in connection therewith; that she received cash in partial liquidation of the Bank and new stock certificates in conformity with the reduction in capital stock merely in lieu of the older certificates to represent the part of her stock not canceled by the reduction in capital stock and liquidation, which she contends was effective prior to and separate from the reorganization.

---

[1] (h) *Definition of partial liquidation.*—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

We have examined with care the facts involved. They do in some ways bear out petitioner's theory; but in many others they contradict it. The facts are not consistent with each other. The evidence is contradictory as to the effective date of the liquidation, as to whether it was prior to merger or coincidental therewith. The merger agreement between the Bank and Straus provides that the assets to be distributed to stockholders shall be transferred to the distributing agent as of the effective date of the merger, which is specifically stated to be the close of business on September 15, 1931, and that the assets distributed shall be valued as of the effective date of the merger. Yet, the circular letter accompanying the notice to stockholders sent out August 8, 1931, states that the capital structure of the Bank will be altered prior to the effective date of the merger, while the contract between the Bank, Straus, and Continental Corporation provides for reduction of capital of the Continental Corporation prior to the effective date of the merger, and that after such change of capitalization of Continental becomes effective all its assets shall be sold to the distributing agent. This sale was, in fact, made on September 15, 1931. The change in capitalization of the Bank (and Continental Corporation owned by the Bank's stockholders) took place prior to September 15, 1931, being voted August 31, and the certificate being executed August 31, approved by the Superintendent of Banks September 11, received in Albany, New York, September 13, and recorded in the office of the County Clerk in New York on September 15. The transfer of assets to the distributing agent was made on September 15, before the completion of the merger. Petitioner relies heavily upon these facts to demonstrate liquidation prior to and separate from the merger.

After reviewing in detail all of the intricate facts involved, we come to the conclusion, not wholly without hesitation, that petitioner has not shown such priority and separation of liquidation from merger. True, the reduction of capital stock of the Bank and its associate, Continental Corporation, was prior to merger, in the sense that the reduction was voted, certified, and recorded prior thereto. Yet, it has not been demonstrated that such reduction became, in fact, effective prior to actual exchange of stock in accordance with the reduction. We understand the actual decrease to be effected by the actual transfer in, and out, of stock under the New York statute under which the reduction here took place. Op. Atty. Gen. (1896) 64. Even if the reduction in capital stock were effective prior to merger, this would not answer our question, which is, of course, whether the liquidation is no essential part of the merger. It must be an essential part thereof, and not merely connected in some way therewith, in order to have the effect for which respondent here contends, under

section 112 (c) (1) of the Revenue Act of 1928. *Liquidating Co.*, 33 B. T. A. 1173; *General Motors Corporation*, 35 B. T. A. 523, 525; *Walter B. Lashar*, 34 B. T. A. 768, 777; *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462.

Review of the complicated facts here involved leads us to believe that the liquidation was such essential element of the reorganization. It is true that the contracts do not in express terms make the merger conditional or contingent upon liquidation, and it is plain that the participants intended to so reduce the capital of the Bank as to put only a portion of its assets into the merger. Yet, it is obvious that the liquidation enters intimately into the plan. In the first place, the resolution of the board of directors of the Bank on July 31, 1931, recommended, "as a part of the program contemplated by said agreement" (with Straus and International) that the capital be decreased to 352,000 shares and then increased to 400,000 shares. Again, the notice to stockholders, the accompanying explanatory letter, and the action taken at the stockholders' meeting on August 31, 1931, recite the liquidation as only one item of several, i. e., the contracts, the proposed merger, reduction and increase of capital stock, sale of new stock to Straus and International, and purchase of assets of the Continental Corporation for $4,000,000. These matters, proposed in the same notice, discussed in the same letter, voted on in the same meeting, and all therein adopted by the same number of votes, can not easily be separated, but appear as parts of a single plan, of reorganization. Indeed, the circular letter, after extensive recitation of the above matters, recites "to carry out this plan  *  *  *" and "upon completion of this plan  *  *  *." The agreement between the Bank, Straus, and the Continental Corporation provides for sale of all assets of the Continental Corporation to "the Distributing Agent appointed by the Trust Company [in this opinion referred to as the Bank] pursuant to the provisions of said merger agreement." The "Merger Agreement" between the Bank and Straus states that "the terms and conditions of said merger and the mode of carrying the same into effect shall be as follows"—then recites same under numbered paragraphs and in paragraph "Third" recites the provision for distribution by the distributing agent to the stockholders of the Bank of all its assets in excess of those of a value as of the effective date of the merger, equivalent to liabilities other than capital, surplus, undivided profits, and reserves, plus $9,500,000. Thus specifically paragraphed and numbered as one of the "terms and conditions of said merger and the mode of carrying same into effect", the distribution in liquidation can not be said to be no essential part of the merger.

Moreover, it is to be noted that the distributing agent acted not merely in distributing assets in partial liquidation to stockholders, but

he received assets of much greater value than those distributed, and used such assets in dealing with the Continental Corporation. He received assets of $7,841,091.57, including cash of $4,016,482.52. There was paid to the Continental Corporation $4,000,000 for assets belonging to it. He sold certain assets to the Continental Corporation for $4,000,000. He paid $8 per share to holders of 558,700 shares of stock in the Bank, or $4,469,600. Since the stockholders were to receive only about $1.40 per share in addition, or about $782,180, or a total of $5,251,780, it is obvious that the distributing agent, receiving $7,841,091.57, received large assets for disposition other than to the old stockholders of the Bank, and in connection with the merger. In addition, the circular letter accompanying the notice to stockholders not only refers to "the plan contemplated" (referring obviously to the merger already therein recited), but states that "On completion of the plan contemplated, each present stockholder of the Continental Bank will for each share of stock now owned by him receive 63/100ths of a share of stock in the continuing bank together with a beneficial ownership of 63/100ths of a share of stock of the Continental Corporation, and $8.00 in cash upon the completion of the merger and, subject to liquidation of the remaining assets, approximately an additional $1.40 in cash at a later date." Petitioner received in stock 1,946.7 shares, which is 63/100ths of her former 3,090 shares—and the $24,720 is $8 per share on the 3,090 former shares—as stated on the checks received by her. The cash and stock were to be received and were received "on completion of the plan contemplated." We think it could have been denied to the stockholders until completion of the merger, and that under all the circumstances, the old stock was exchanged for new stock in the Bank, certificates of beneficial ownership of new stock in the Continental Corporation, and money, under section 112 (c) (1) of the Revenue Act of 1928.

The decrease in capital stock and partial liquidation of the assets of the Bank, though plainly intended as such partial liquidation and duly effected, can not, in our opinion, in the face of all of the facts above recited, be viewed as an integer so separate from the reorganization as not to be considered therewith for the purposes of the revenue act. We have considered *Kelly* v. *Commissioner*, 97 Fed. (2d) 915, but find that, though the question of liquidation entered therein, that of application to a concurrent and closely connected admitted reorganization did not. It therefore is not of material assistance here. *United States* v. *Rodgers*, 102 Fed. (2d) 335, does involve the question of reorganization, but the element attempted to be considered as a part thereof was a sale of stock, not a distribution in liquidation as here. Though the court does not neglect

the question of whether there was one transaction, or two, involved (as herein), the decision is based in the main upon the fact that in a literal sense a sale was, in terms, made and that the statute, section 203 (b) (1) (4) of the Act of 1926, refers to an "exchange" of stock, and not to sale. Also, the court finds that the sale was "divided sharply" from the other transactions. This sharp division we can not find herein. The case, therefore, is not deemed determinative here. We believe, rather, that the liquidation is an essential part of the whole plan of reorganization within the thought and scope of *Helvering* v. *Elkhorn Coal Co.*, 95 Fed. (2d) 732; *Helvering* v. *Minnesota Tea Co.*, 89 Fed. (2d) 711; *Starr* v. *Commissioner*, 82 Fed. (2d) 964; *Thurber* v. *Commissioner*, 84 Fed. (2d) 815; *Ahles Realty Corporation* v. *Commissioner*, 71 Fed. (2d) 150; *West Texas Refining & Development Co.* v. *Commissioner*, 68 Fed. (2d) 77.

We conclude and hold, therefore, that petitioner's stock was exchanged for stock and money in pursuance of the plan of reorganization, within the purview of section 112 (c) (1) of the Revenue Act of 1928.

On the question of the amount of taxable income realized, the parties disagree on three points—first, the fair market value of the new stock; second, whether, as the respondent contends, we should allocate the fair market value of the stock and cash received in the exchange equally to two blocks of stock, each with a separate basis, or, as the petitioner contends, compute the profit on the basis of an exchange of a single block of stock acquired in 1929; and, third, whether any part of the cash received is taxable as a dividend.

■ The Bank's stock was an unlisted security. The respondent's value of $21.75 per share is the mean of the bid and asked prices for the stock on September 15, 1931, listed in the Wall Street Journal as counter market quotations, but such prices were quotations upon the old stock, there being no quoted price for the new stock prior to September 21, 1931. We are not concerned with the value of the old stock at any time. On September 21, 1931, the same publication shows the prices of the new stock to be 16½ bid, 18½ asked, a mean of $17.50. From this evidence we find that the stock had a fair market value at the time received by the petitioner of $17.50 per share.

■ As to the second point the petitioner contends that the exchange in 1929 of stock issued in the name of the Continental Bank of New York for stock in the name of the Continental Bank & Trust Co. of New York, share for share, resulted in the receipt of stock in a new corporation in a nontaxable reorganization and that the stock so received does not represent property acquired at different times at different prices. The respondent argues that the Continental Bank of New York merely changed its name, and consequently petitioner

received nothing more for her old stock than a like number of shares issued in the new name of the corporation. We agree with the respondent.

The Bank was organized and operated as a bank until 1929, when it followed the procedure set out in section 138 of the Banking Law of New York, as amended by chapter 10 of the 1923 Laws, to become a trust company. It does not appear that section 138 has ever been interpreted by the courts. It provides that when the trust company comes into existence all property and rights of the bank:

* * * shall immediately by act of law and without any conveyance or transfer, and without any further act or deed, be vested in and become the property of such trust company, which shall have, hold, and enjoy the same in its own right as fully and to the same extent as the same was possessed, held and enjoyed by said bank; and such trust company shall be deemed to be a continuance of the entity and of the identity of said bank operated under and pursuant to the laws of this State, and all the rights, obligations and relations of said bank to or in respect of any person, estate, creditor, depositor, trustee or beneficiary of any trust and in or in respect to any executorship or trusteeship or other trustee or fiduciary function, shall remain unimpaired, and such trust company as of said beginning of its corporate existence shall by operation of this section succeed to all such rights, obligations, relations and trusts, and the duties and liabilities connected therewith, and shall execute and perform each and every such trust or relation in the same manner as if said trust company had itself assumed the trust or relation, including the obligations and liabilities connected therewith.

Other statutes of the State of New York provide for merger of trust companies and they have been construed to mean that a merged corporation does not continue to exist as a part of the merging corporation but remains a corporation with the sole power of being sued and defending causes of action alleged to exist against it at the time of the merger. *In re Bergdorf's Will*, 206 N. Y. 309; 99 N. E. 714; *In re Wolbert's Estate*, 144 Misc. 328; 259 N. Y. S. 127. However, the statute relating to mergers does not apply when a bank is transformed into a trust company, that situation plainly being covered by section 138.

Federal statutes provide that when a state banking institution is merged with a national bank " * * * the corporate existence of each of the constituent banks and national banking associations participating in such consolidation shall be merged into and continue in the consolidated national banking association and the consolidated association shall be deemed to be the same corporation as each of the constituent institutions", but that "No such consolidation shall be in contravention of the law of the State under which such bank is incorporated." Sec. 34-a, title 12, U. S. Code Annotated. The law has been construed to mean that in the absence of a state statute to the contrary, "the corporate identity of the merged state institution

is not lost, but continues, in spite of the fact that it gives up one charter and takes another * * *." *Adams* v. *Atlantic National Bank of Jacksonville*, 155 So. 648. To the same effect are *Michigan Insurance Bank* v. *Eldred*, 143 U. S. 293; *Metropolitan National Bank* v. *Clagett*, 141 U. S. 520; *Poisson* v. *Williams*, 15 Fed. (2d) 582.

In *Citizens Trust Co.*, 20 B. T. A. 392, we held that upon the merger of two trust companies under the laws of New York, the corporate existence of the merged institution is not extinguished to the extent of acquiring a right to deduct organization expenses as a loss.

The transformation of the Bank into a trust company did not involve the acquisition of new assets, alteration of capital structure, or new stockholders. The effect of change was merely an alteration of powers with no loss of assets or increase of liabilities. To hold that a corporation separate and distinct from the banking institution came into existence would require us to ignore the plain statutory declaration that when a banking institution changes into a trust company the former's entity and identity shall continue. No rule called to our attention or within our knowledge compels such a conclusion. Accordingly we hold that the certificates which the petitioner received in 1929 in the name of the Continental Bank & Trust Co. for stock issued in the name of the Continental Bank of New York, share for share, were not for stock of a different corporation. One-half of the reissued certificates continued to have a basis of $14,420 and the other half a basis of $41,200. *Solomon B. Kraus*, 33 B. T. A. 1088; affd., 88 Fed. (2d) 616; *Christian W. Von Gunten*, 28 B. T. A. 702; affd., 76 Fed. (2d) 670; *Jacob Epstein*, 36 B. T. A. 109.

■ As to the third point, whether cash received was taxable as dividend: Respondent regards petitioner as receiving for her old stock, new stock and certain cash, which cash, to the extent that it was paid from earnings since February 28, 1913, he treats as taxable as a dividend. We have above concluded that stock and cash were in fact received ratably for the old stock pursuant to a plan of reorganization. Therefore, to any extent that the cash was paid from earnings accumulated since February 28, 1913, the cash received by petitioner should be taxed as dividend. The burden is upon the petitioner to demonstrate that it was not so paid, the respondent having determined it to be taxable as dividend. The petitioner admits that there were earnings since February 28, 1913, in the amount of $1,343,-697.43. This amount is more than sufficient to cover the amount considered by the Commissioner as taxable, since he calculates a taxable dividend of $2.1265 per share, 558,700 shares participated, and the amount involved would therefore be $1,188,075.55.

Has petitioner demonstrated that this amount of earnings was not distributed? That amount, and in excess of that amount, in fact,

was distributed. Was it distributed from the earnings since February 28, 1913? To demonstrate that it was not, petitioner contends only that the earnings were dissipated by a loss taken by the distributing agent of $1,668,313.50 by canceling 41,300 shares of Bank stock at about $40 per share, and a further loss of $925,790.40 incurred in the distributing agent's purchase from Continental, for $4,000,000, of net assets worth only $3,074,209.60 (assets received $4,479,191.98, less liabilities assumed $1,404,982.38). If these alleged losses are to be deducted from the earnings since February 28, 1913, none were left for a distribution taxable as dividend, and the distribution actually made to the stockholders, including petitioner, was from other funds, that is, from capital and paid-in surplus, since the evidence shows that the distributing agent received only the three items, capital, paid-in surplus, and earned surplus. We think petitioner has not demonstrated that the two losses contended for by her were from earned surplus. The cancellation of the stock on the effective date of the merger had been directed by the stockholders of the Bank by resolution on August 31, 1931, and the distributing agent therefore appears, in canceling the stock, merely to have acted as the agent of the bank for that particular purpose, and not in his capacity as distributor. In canceling the stock, he distributed nothing. The mere cancellation of the stock resulted in no loss to him as distributor. In any event, to the extent of its par value, $413,000, any such loss would be charged to capital and not earned surplus. The stockholders of the Bank had voted to make a contribution of $4,000,000 to Continental. At the meeting of the board of directors of the Bank on July 31, 1931, the president had explained that the capital structure of the Continental would be altered by reduction to 352,000 shares and that a surplus of $2,500,000 was to be provided for Continental. The loss taken by the Bank in the purchase and cancellation of the stock was gain, in the same amount, to Continental, and in that way was a contribution by the Bank to Continental, plainly in accord with the intent to alter the capital structure of Continental, as well as the Bank. Capital, paid-in surplus, and earned surplus, of the Bank in a total sum of $7,841,091.57, were available for that purpose and the other purpose, i. e., distribution. There is no presumption that the earned surplus was dissipated in making the contribution to Continental, and, in the light of the intent to change capital structure and at the same time to make a distribution, it appears more reasonable to believe that the contribution was from capital or paid-in surplus, rather than an invasion of the earned surplus funds necessary to make the distribution. At any rate, respondent's treatment amounts to a determination that the distribution was from earned

surplus, and we think petitioner has failed to show otherwise as to the cancellation of stock.

The same considerations apply to the loss taken in the transfer of assets of Continental valued at $3,074,209.60 for $4,000,000. This was gain to Continental, a part of the contribution by the Bank to it, with nothing to show that earned surplus instead of paid-in surplus or capital should be charged with the loss. These matters were represented by bookkeeping entries on, or as of, September 15, 1931. No actual payment from earned surplus, by check or otherwise, is shown. Though $4,000,000 was the consideration to Continental for assets of only $3,074,209.60, on the same day $4,000,000 is the consideration from Continental for the stock of the 30 Broad Street Corporation.

Moreover, the figure as to earned surplus, considered by petitioner, and admitted by her as received by the distributing agent in the amount of $1,343,697.43, is based upon the balance in the Bank's earned surplus account as of September 15, 1931, with necessary adjustments for earnings prior to March 1, 1913, transfers from the account to capital and paid-in surplus, and contributions by stockholders to earned surplus. The book entry is evidential of the Bank's earnings, but not conclusive. *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179. We recently held that, under the circumstances prevailing in the proceeding, book figures submitted as evidence of lack of worthlessness of stock were sufficient to shift the burden of proof. *B. F. Edwards*, 39 B. T. A. 735. Here the respondent has made a determination that upon the completion of the transaction with the Continental Corporation and the cancellation of 41,300 shares of Bank stock, the distributing agent had in his possession, and actually distributed to the Bank's stockholders, earnings since February 28, 1913, in the amount of $1,188,075.55. This finding of the respondent is presumed to be correct. Nothing appears of record that the respondent did not take the dealings of the distributing agent in liquidating assets into consideration in arriving at his result. The figure submitted by the petitioner as correct contains an upward adjustment of earned surplus for appreciation of $109,215.11 in the value of certain assets transferred to the distributing agent. This adjustment, contrary to the prevailing rule in such matters, *Elton Hoyt, 2nd*, 34 B. T. A. 1011, casts considerable doubt upon whether the balance in the account, which we are asked by the petitioner to accept as correct, reflects the true earnings of the Bank since February 28, 1913. For instance, as the Bank regarded unrealized appreciation in the value of amounts as requiring a write-up in earned surplus, the account may, if the theory was consistently carried out, contain adjustments for depreciation in value of assets during prior years. For aught we know, the account

may reflect changes computed on other than cost. See *Loren D. Sale*, 35 B. T. A. 938. We therefore think the book figure as to earned surplus is not sufficient basis for petitioner's contention.

From the record made, we find no error in respondent's determination that of the amount received by petitioner $3,285.44 is taxable as a dividend.

Petitioner also contends that she had no income because she immediately used same to discharge a purchase-money lien given for the price of the stock involved. Such contention is denied as obvious error.

Reviewed by the Board.

*Decision will be entered under Rule 50.*