Estelle Pardee Erdman v. Commissioner. Charles R. Erdman v. Commissioner.
Erdman v. Commissioner
Docket Nos. 4699, 4700.
United States Tax Court
1946 Tax Ct. Memo LEXIS 279; 5 T.C.M. (CCH) 63; T.C.M. (RIA) 46038; January 25, 1946
Irving Riker, Esq., and Thorpe Nesbit, Esq., for the petitioners. Robert S. Garnett, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These cases were consolidated for hearing and report, and involve deficiencies in income tax as follows: Docket No. 4699
Docket No. 4700
1939
$ 5,841.27
1939
$30.10
1940
7,305.22
1941
15,826.55
The questions raised by the petitioner in docket No. 4699 are whether respondent erred in determining that gain realized in *280 1939 from the sale of timber should be increased by $986.79, and whether certain alleged loans are allowable as bad debt deductions, some amounting to $50,000, in 1939, 1940 or 1941, and others, amounting to $11,931.40, in 1939. By an amended answer the respondent alleged that the petitioner realized a gain of $6,956.04 in 1941 in connection with the reorganization of the Blackwood Coal & Coke Co., and sustained a loss of $154.02 instead of $324.14 on her interest in a certain trust and claimed an increased deficiency on account of the alleged errors. The allegation of error respecting the loss was settled at the hearing and will be reflected in the Rule 54 recomputation. The sole issue in docket No. 4700 is whether the petitioner is entitled to a bad debt deduction of $2,197.90. Gain on Sale of Timber Findings of Fact Petitioners are husband and wife and reside in Princeton, New Jersey. They filed their income tax returns for the taxable years with the collector for the first district of New Jersey. The wife, the petitioner in docket No. 4699, will be referred to herein for convenience as the petitioner. In 1939 the Pardee family, of which petitioner was a member, and the *281 Howe family, owned an aggregate of about 13,860 acres of land in three tracts situated in Knott, Perry and Breathitt Counties in Kentucky. The legal title to the land owned by the Pardee family was held by Ario Pardee. The petitioner owned an undivided one-eighth interest in about 6,100 acres, comprising one of the two tracts owned by the Pardee family. She had no interest in the other lands. On August 3, 1939, the owners of the lands and the Bryant Stave & Heading Co. entered into a contract for the sale of all of the merchantable live timber on the three tracts of land. Provision of the contract gave the Bryant Stave & Heading Co. eight years from October 1, 1939, in which to cut and remove the timber from the lands, for which timber it was to pay the owners $8 a thousand feet for all white oak suitable for making bourbon staves, subject to a provision in the contract for payment of a premium and specified amounts for other timber. Other material provisions of the contract read as follows: It is the intention of the Second Party to cut White Oak timber suitable for bourbon staves in advance of other kinds of timber in each certain named or numbered area worked. For the purpose *282 of assuring to First Parties that all timber listed above, other than White Oak suitable for bourbon staves, of the diameter measurements above set forth, shall be cut from each such area, Second Party agrees to pay to First Parties a premium of Four Dollars ($4.00) per 1,000 feet for such White Oak so cut in addition to the Eight Dollars ($8.00) per 1,000 feet price; such premium to be applied by First Parties as a credit on the other kinds of timber than such White Oak cut by Second Party in the named or numbered area of operations from which such White Oak was cut; and, if there is any balance of such premium after all timber in such area to be cut by Second Party hereunder has been cut, such balance shall be applied by First Parties as a credit to Second Party on timber other than White Oak, in its later settlement for its operations elsewhere. Any balance of such premium that may remain on expiration or termination of this contract shall be credited to Second Party on final settlement. Second Party may commence operations under this Contract at any time after its execution, and shall in any event commence operations not later than October 1, 1939. The first settlement by Second *283 Party with First Parties shall be made on the 15th day of the month following the commencement of operations, and on the 15th day of each month thereafter, for all timber cut during the preceding calendar month; and at each settlement Second Party shall furnish First Parties with a statement of the timber so cut and where cut, showing the footage, kinds of timber, and amount due, and shall accompany such statement with a good check for the amount shown thereon to be due First Parties by Second Party. * * * * *
Second Party undertakes that so long as this contract is in force its minimum payments to First Parties for each year will amount to Forty Thousand Dollars ($40,000.), and should the quantity of timber cut in any year, at the prices herein stated, be less than that amount, Second Party shall pay to First Parties the difference between the price for the timber so cut in such year and $40,000; provided that such excess payment shall be carried over as a credit to Second Party in any succeeding year when the payments due from Second Party under this contract would be more than $40,000. If, on the other hand, in any year payment for the timber cut by Second Party hereunder *284 shall exceed $40,000 per year, such excess payment shall carry over as a credit to Second Party on the minimum for ensuing years. The intention being that for each year this contract is in force First Parties shall receive $40,000 per year from the timber cut hereunder, and any additional amount that the total quantity of timber cut hereunder at the prices herein stated shall exceed an average of $40,000 per year. If Second Party ceases operations on said lands before the expiration of said eight-year period, such minimum shall not apply to the part of the fiscal year in which Second Party ceases its operations. First Parties [owners of land] hereby constitute and appoint Ario Pardee and A.G.B. Steel as their Agents in their dealings with Second Party, and Second Party shall make settlements and payments hereunder with said Agents. * * * * *
On the signing of this agreement, Second Party shall deposit with Ario Pardee and A. G. B. Steel, as Agents for Parties of the First Part, the sum of Fifteen Thousand Dollars ($15,000.) in cash, to be held by them to insure the faithful performance of all the terms of this contract by Second Party. This sum shall be returned to Second *285 Party on the termination of this contract when all amounts due First Parties by Second Party hereunder shall have been paid in full, except as hereinafter provided. Should Second Party cease its timber or lumbering operations under this contract at any time before its expiration (except temporary shutdowns), then this contract shall be at an end. The remaining standing timber of that herein conveyed shall revert to First Parties, and all rights and liabilities of the parties hereunder shall terminate except that Second Party shall owe and pay to First Parties all sums then due hereunder, and in addition thereto there shall be paid over to First Parties said Fifteen Thousand Dollars ($15,000.) deposit which the parties agree shall be the premium or consideration to be paid by Second Party to First Parties for the privilege in Second Party of terminating this contract before the stated time of its expiration. In 1939 the Bryant Stave & Heading Co. paid to Ario Pardee and A. G. B. Steel, for the account of the various interests, the contract price of $8 for each 1,000 feet of White Oak cut from the lands and in addition thereto, a premium of $6,315.46 for such timber, computed at the *286 rate of $4 a thousand feet. The amount received as a premium was deposited in a joint bank account and entered in an account entitled "Prepaid white oak timber." No part of the amount of $6,315.46 was distributed to petitioner and other owners of the lands in 1939. The fund was distributed to the parties in interest in and after 1940, when the recipients reported the amounts received as taxable income to them. Opinion In his determination of the deficiency for 1939, the respondent increased the amount of gain realized by petitioner from the sale of timber by $986.79, an amount representing her proportionate share of the premium price paid for the cutting of white oak timber. The amount of gain is not in controversy. The petitioner argues that the payments were made, in effect, as security for the performance of the contract by the Bryant Stave & Heading Co. and that until timber other than white oak was cut it could not be determined in what proportions the premium payments should be credited to the parties in interest. Respondent contends that the petitioner's share of the money in question was received by her agents under a claim of right, without restrictions as to its disposition, *287 and therefore constituted taxable income to her in the year of receipt by her agent. In North American Oil Consolidated v. Burnet, 286 U.S. 417, the Court said: * * * If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * The premium payments involved herein were made as an inducement to cut other, and apparently less desirable, timber on the land and were to be applied as a credit on the price of other timber to be cut in the area from which the white oak was removed, any excess credit to be applied to timber other than white oak in other areas until the termination of the contract, when any excess credit in the amount was to be paid to the Bryant Stave & Heading Co. No provision was made in the contract for refunding the premium payments if timber other than white oak was not cut. Thus, the money in question *288 represented a prepayment for timber other than white oak, and an additional payment for white oak if other timber was not cut under the contract. The only contingency in connection with the payment was whether there would be a balance in favor of the Bryant Stave & Heading Co. upon the termination of the contract. Such a possibility is not material, as the amount payable by petitioner at that time would be deductible from her gross income in the year of payment. North American Oil Consolidated, supra. In Clinton Hotel Realty Corp. v. Commissioner, 128 Fed. (2d) 968, the money in question was deposited as security for the faithful performance of a lease by the lessee. Here the Bryant Stave & Heading Co. made a cash deposit of $15,000 as security for its faithful performance of the contract. Any damages sustained by the land owners from default of the Bryant Stave & Heading Co. was secured by such fund. That petitioner and the other land owners understood that the premium was paid for timber, rather than as security, is evident by the distribution and return for taxation in 1940, prior to the termination of the contract, of part of the premium payments *289 made in 1939. If the premium moneys deposited in 1939 were for timber from lands other than those in which the petitioner had an interest, she would be entitled to no portion; and if the tract of land in which petitioner had an interest contained no timber other than white oak, her probabilities of obtaining a proportionate share of the premium money paid in 1939 would be remote. The premium payments made in 1940, and here involved, were necessarily for timber (other than white oak) from petitioner's land, and may be for timber cut in 1939 or 1940. But no such proof was made as to which year. We do not know from what part of the three tracts timber was cut in 1939. It is not contended that the amount included in her income by the respondent represents an arbitrary figure. See Helvering v. Taylor, 293 U.S. 507. The distributions in and after 1940 of the premium payments made in 1939 disclose a means of determining the rights of the parties in interest to payments prior to completion of the contract. The amounts involved appear to be income, either current or prepaid, under the contract. Petitioner had the burden of proving that the income received by her agent did not *290 represent income to her in the amount determined by the respondent. Having failed to make such proof, the action of the respondent is sustained. Loans to Calvin Pardee Erdman Findings of Fact From 1920 to 1929, inclusive, the petitioner loaned to her son, Calvin Pardee Erdman, hereinafter referred as to "Calvin," amounts aggregating $63,500 for investment and speculation purposes. Payments aggregating $11,500 were made on the loans from October 1929 to November 26, 1936. During the years 1930 to 1934, inclusive, petitioner loaned a total of $248,000 to Calvin and his wife, Eleanor D. Erdman. On November 26, 1936, Calvin and his wife gave petitioner their joint note for $300,000 for the loans. In 1929, Eleanor D. Erdman loaned $200,000 to her husband for the purpose of meeting demands for additional margin in stock accounts. The borrower gave his wife a note for the loan, payable upon demand, with interest at 6 per cent or the average call money, whichever was higher. No part of the loan has been repaid. In 1930, 1931, and 1932, petitioner loaned to Calvin and his wife securities of a value in excess of $300,000, for which in 1936 or 1937 they gave petitioner their joint *291 note in the amount of $300,000. The note was replaced on January 1, 1940, by three notes of Calvin and his wife, two for $60,000 and $200,000, payable to petitioner on or before December 31, 1950, and December 31, 1952, respectively, with interest at 5 per cent, and one for $40,000 payable to Charles R. Erdman, petitioner's husband. On June 15, 1937, petitioner gave Calvin two checks totaling $20,000 for which Calvin gave petitioner his note dated June 15, 1937, for $20,000 payable on or before December 15, 1937, with interest at 6 per cent. In July 1937, the petitioner drew three checks aggregating $30,000 in favor of the First Trust & Savings Bank of Pasadena, which deposited them to the credit of Calvin. Calvin gave petitioner his note dated July 26, 1937, for $30,000 payable on or before December 15, 1937, with interest at 6 per cent. At the time petitioner made these loans in the amount of $50,000, she knew he had an interest in three trusts created by his grandfather. At that time she was of the opinion that the Treasury Department had placed a valuation of about $4,000,000 on the Schuylkill coal lands as of 1919, and believed her son could repay the loans out of his interest *292 in the lands. The notes had no value when received by petitioner. On October 30, 1918, Calvin Pardee, father of petitioner, transferred certain property in trust with directions to pay $100 a month therefrom to each of ten of his grandchildren, including Calvin Pardee Erdman, or their descendants, in the event of death of a beneficiary during the life of the trust. When all of the grandchildren reached 30 years of age, or died, the corpus of the trust was to be distributed among living grandchildren, and descendants of any deceased grandchildren. Distributions of principal and income were not subject to anticipation, execution, attachment, debts, contracts or engagements of the beneficiaries. Calvin Pardee Erdman had in and after 1936 a one-tenth interest in the trust. The market value of the securities in the trust of October 30, 1918, was, in round numbers, $298,000, $216,000, $227,000, $255,000, $248,000, and $200,000 at the close of the years 1936 to 1941, inclusive, respectively. The trust terminated in 1942 or 1943, when Calvin received his one-tenth share of the estate. The last will and testament of Calvin Pardee left his residuary estate in trust for the payment of an *293 annuity to his wife for life. Upon her death, a sufficient amount of corpus was to be held in trust to provide income of at least $20,000 per annum for distribution to grandchildren of the testator then living and descendants of grandchildren then deceased until grandchildren living at the time of the testator's death attained the age of 30 years, when the principal of the fund was to be distributed to them in like proportions. In and after 1936 Calvin's interest in the testamentary trust was one-eleventh. The market value of the securities in the trust was, in round numbers, $481,000, $396,000, $413,000, $446,000, $419,000, and $398,000, at the close of the years 1936 to 1941, inclusive, respectively The trust corpus has not been distributed. On July 7, 1919, Calvin Pardee and his wife transferred certain coal lands situated in Schuylkill County, Pennsylvania, in trust, with directions to pay the income therefrom equally to grandchildren of the grantors then living and descendants of deceased grandchildren until the death of the last survivor of children of the grantors, when the trust was to terminate. The grantors had 10 grandchildren at the time the trust was created. Thereafter, *294 two grandchildren were born, and in 1935 one grandchild died. The interest of Calvin in the trust at the close of 1937 was one-eleventh. In about December 1925 the trustees of the trust of July 7, 1919, filed a statement with the Bureau of Internal Revenue in which the coal lands in trust were reported as having a value of $4,376,236.96, as of 1919 In October 1926 a valuation engineer of the Bureau of Internal Revenue valued the lease of the Schuylkill coal lands as of July 7, 1919, for depletion purposes in 1922. From March 1, 1927, to September 2 1932, the trustees of the trust created on July 7, 1919, borrowed an aggregate of $250,000 from the Philadelphia-Girard National Bank, without security. Thereafter, to June 4, 1934, the loan was increased to $279,000. The loans were secured after October 20, 1932, by a first mortgage on the coal lands in the trust. No payments were ever made on the loans. A lease covering the lands was assigned to the Philadelphia National Bank on June 20, 1934. On June 5, 1936, the bank charged the loan to reserve for contingencies on account of a report of engineers that the coal mines had been permitted to fill with water, that the lessee of the *295 lands was and had been since 1935 in receivership, and that the loan should not be carried on the books at any value. The bank sold the note on March 3, 1941, for $20,000. Thereafter, the purchaser of the note, rather than foreclose under the mortgage, gave the trustees $1,000 for a deed to the coal lands. This amount, together with a balance of $328.89, was distributed to the bank by the trustees upon the termination of the trust in 1943. In her return for 1937, Eleanor D. Erdman claimed as a bad debt deduction $75,000 of the debt of $200,000 owed to her by her husband, under a loan made in 1929. The following reason was given for the deduction: Up to the last half of 1937 there was every reason to believe the debt could eventually be paid. The financial reverses of the payor during the months July to December 1937 make payment of the entire debt hopeless. In connection with a question raised as to whether the bad debt deduction should be allowed, Calvin notified a revenue agent in writing in November 1939 that more than $75,000 could have been declared worthless, and that his working capital at the close of 1937 was practically zero. In June 1940 the creditor informed the *296 same agent that the debtor's liabilities at the close of 1937 were $104,000 in excess of his assets. On January 3, 1938, Eleanor D. Erdman assigned to her husband $20,000 for each of the years 1938, 1939, 1940, and 1941, out of her share of the income of a trust estate held by the Northern Trust Co. The assignment was made for the purpose of furnishing her husband with more income. In her return for 1938, Eleanor D. Erdman claimed a deduction of $34,916.71 for an amount paid as a guarantor of a brokerage account of her husband for 1937 and 1938. Calvin had no means of making a sizeable bank loan at the close of 1937 without the signature of his wife. Financial statements prepared by Calvin disclose that on July 26, 1937, and as of the close of 1937, his liabilities exceeded his assets by about $2,000 and $45,000, respectively, without including liability to petitioner for loans on which his wife was jointly liable, or accrued interest on loans, and by including his interest in the trust for Schuylkill coal lands at a value of about $355,000. His deficit computed on the same basis, except for a reduction each year of about $3,000 in the value of his interest in the trust, at *297 the close of 1938, 1939, and 1940, was about $52,000, $50,000, and $65,000, respectively, and about $404,000 at the close of 1941, without including any amount for his interest in the trust. The petitioner would not have instituted legal proceedings against her son to collect the loan of $50,000 made to him in 1937. The will executed by petitioner in 1935 contained no bequest to her son Calvin. In 1941 she executed a codicil to her will bequeathing to him and his wife all indebtedness owing by him to her upon the condition that they pay any inheritance and estate taxes assessed by reason of the inclusion of the indebtedness in her estate. Opinion The issue relates to the two loans aggregating $50,000 made by petitioner to her son Calvin, in 1937. The petitioner claimed all of the amount as a bad debt deduction in her returns for 1939 and 1940, and $40,000 of the amount in 1941. The respondent disallowed the deduction each year without giving any grounds for his action. Section 23 (k) (1) of the Revenue Act of 1938, as amended by subsections 124 (a) and (d) of the Revenue Act of 1942, *298 retroactive to years beginning after December 31, 1938, allows as a deduction "debts which become worthless within the taxable year." Prior to the amendment the statute allowed as deductions "Debts ascertained to be worthless and charged off within the taxable year." The petitioner contends in her opening brief that she is entitled to the deductions as debts ascertained to be worthless and charged off within one of the taxable years. She contends in her reply brief for the first time that the statute, as amended, is a denial of due process to the extent that it is made retroactive to the taxable years, and is unconstitutional. It has been held in numerous cases that income tax provisions having retroactive application are constitutional. Brushaber v. Union Pacific Railroad Co., 240 U.S. 1; United States v. Hudson, 299 U.S. 498; Fesler v. Commissioner, 38 Fed. (2d) 155; Phipps v. Bowers, 49 Fed. (2d) 996; John S. Garvan, 23 B.T.A. 817; Edgar Stanton, 34 B.T.A. 451. In Welch v. Henry, 305 U.S. 134, the Court sustained the constitutionality of a state statute enacted in March 1935 levying *299 an income tax on corporate dividends received in 1933. The Court said: * * * In each case it is necessary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation. Numerous decisions were cited to support a statement of the Court in its opinion that "The contention that the retroactive application of the Revenue Acts is a denial of the due process guaranteed by the Fifth Amendment, U.S.C.A. Const. Amend. 5, has been uniformly rejected." In connection with the amendment of 1942, Congress enacted a special limitation period of seven years, applicable to taxable years beginning after December 31, 1938, in lieu of the three-year period, with respect to claims for credit or refund relating to deductions of bad debts in years in which they did not become worthless. Section 169, Revenue Act of 1942. The effect of this amendment is to place taxpayers in the *300 position they would have been respecting bad debt deductions if the change in the prior act had been made in 1938, effective January 1, 1939. The special limitation period for bad debt deductions eliminates any oppressiveness or harshness resulting from the retroactive feature of the provision in question. The retroactive provision is constitutional, assuming that the question has been properly raised. It is well settled that a debt may not be deducted at any time as a bad debt unless it had value when acquired. Eckert v. Burnet, 283 U.S. 140, involving the 1926 Act. Kinkead v. Commissioner, 71 Fed. (2d) 522. The burden of proving that the debts in question were not worthless when acquired was upon the petitioner. The individual borrowings of the debtor from petitioner and jointly with his wife, extended over a period of 17 years, ending with the loans in question in 1937 and were very extensive. The individual loans from 1920 to 1930 amounted to $63,500 and in 1937, $50,000. In addition thereto, he borrowed $200,000 from his wife in 1929 and from 1930 to 1934, inclusive, he and his wife, jointly, borrowed about $550,000 from petitioner. Except for *301 $11,500 repaid up to November 26, 1936, on the first borrowings of Calvin from his mother, none of the amounts have been repaid. Thus, exclusive of the $50,000 in question, in 1937 the debtor, individually and jointly, was indebted to petitioner and his wife for $800,000, exclusive of accrued interest. This record of borrowings from petitioner prior to 1937, and lack of repayment was notice to petitioner that any further loans to her son would have little, if any, value. Financial statements prepared by Calvin of his assets and liabilities at the close of 1936 and 1937, and on April 1, June 15, and July 26, in 1937, disclose assets ranging from about $48,000 to $115,000 in addition to his interest in the three trusts, and liabilities ranging from about $58,000 to $144,500 aside from loans from his mother and wife. His interest in the Schuylkill coal lands trust was listed at a value of about $360,000 with nothing to support it other than a report of a valuation made by an engineer of the Bureau of Internal Revenue in 1926, as of July 7, 1919, for the purpose of allowing a deduction for depletion in 1922, and a valuation made by the trustees in 1925 to file with the Bureau of Internal *302 Revenue. The reports were not offered as proof of the value of the property, but merely to show that petitioner and her son had knowledge of the valuations and relied upon them in 1937 in making the loans in question. No showing was made that the valuations were approved by the Commissioner of Internal Revenue. Furthermore, a valuation as of 1919 is too remote from the taxable years to be of much evidential value. The valuations used by Calvin in his financial statements appear to have been made upon the theory that he had a vested interest in the trust fund. Such was not the case. He had a right to one-eleventh of the income of the trust and a like interest in the corpus of the trust, contingent upon his survival of the last survivor of the children of the grantors. No showing was made that Calvin ever received any income from the trust and his interest in corpus ceased to have much value prior to the loans in question. The very small value is shown by the history of the bank loan made to the trustees. The bank loan made in 1927 in the amount of $100,000 and increased to $279,000 by June 1934, and secured by a mortgage on the coal lands from October 1932, was charged to reserve *303 for contingencies by the bank in June 1936 and the note, evidencing the loan, was sold in 1941 for $20,000. Thereafter the purchaser of the note acquired title to the lands by a payment of $1,000 to the trustees in lieu of foreclosure proceedings. It is clear that both petitioner and her son placed too great a value upon the latter's interest in the Schuylkill coal lands trust. The sale of the secured note in 1941 for $20,000 is the best evidence of record on the value of the trust property in 1937. By reducing the value to such amount, we find that his insolvency was about $358,000 greater than he reported it in his financial statements, assuming that his other assets had the values alleged by him. His insolvency in 1937 is also shown by other evidence. He had no bank credit without the signature of his wife on loans, and was unable to meet his liability under brokerage accounts guaranteed by his wife. In the return of Eleanor D. Erdman for 1937, she claimed $75,000, of her husband's indebtedness of $200,000 to her as a bad debt deduction. In connection with a controversy which arose with the Bureau of Internal Revenue concerning the allowance of the claim, the debtor informed *304 a revenue agent in writing that his working capital had decreased to practically zero by the close of 1937. With another communication the creditor attached a statement showing that the debtor's liabilities were $104,000 in excess of his assets at the close of 1937. At the time of taking his deposition the debtor testified that he did not know whether the financial statement was prepared under his directions, but it would be logical to assume that it had been. He further testified that in 1937 he could not have paid the loans made to him by his wife and mother, without access to the corpus of the three trusts of which he was a beneficiary. Such funds were not available to him at that time. The petitioner has failed to show that the notes in question had value when acquired, or on January 1, 1939. The respondent did not err in refusing to allow the deduction. Schaefer Loans Findings of Fact Charles R. Erdman, the petitioner in docket No. 4700, is a minister and in about 1900, Clara M. Schaefer and her two daughters, Katherine and Emily were members of his church in Germantown, Pennsylvania. Later, but prior to 1911, the Schaefers went to Arizona to live on a 160 acre ranch. *305 The petitioner and her husband felt sorry and somewhat responsible for the Schaefers and at various times, at their request, made advances to them for specified purposes, such as to pay for seed and water and land taxes, to enable them to keep their ranch. Between April 7, 1912, and September 23, 1930, petitioner Estelle Pardee Erdman made 18 loans, aggregating $11,931.40, to Clara M. Schaefer, then a widow, and her two daughters, Katherine and Emily, individually and/or jointly. All except three of the loans were evidenced by short-term or demand notes, some with and others without interest. One loan of $1,100, made in 1927, was made upon the representation that it would be used to pay a mortgage on the ranch. Loans of $963.40 and $975 made on February 5, 1926, and December 15, 1926, respectively, were secured by mortgages signed by Clara M. Schaefer, covering a quarter of the ranch. Each mortgage specified that it was subject to a prior mortgage. During the period from May 7, 1911, to May 12, 1938, Charles R. Erdman made six loans, aggregating $2,197.50, to the same persons, individually, for which he received short-term notes, some with and others without interest. On April 12, 1930, Katherine *306 Schaefer gave petitioner a warranty deed to a quarter of the ranch, "Subject to mortgage now against said premises which mortgage the grantee herein assumes," and on March 9, 1932, she gave Charles R. Erdman a waranty deed to another quarter of the ranch, subject to mortgages against the land. The deeds were not examined by Charles R. Erdman and the grantees did nothing with them other than to file the documents with other papers. The Schaefers informed petitioners at times when requesting loans that they intended to sell the ranch and would repay them from the proceeds of sale. The petitioners placed some reliance upon the promises and were of the opinion, without, however, any actual basis for their beliefs, that their advances could be collected out of proceeds of sale of the land. In 1917, a relative of Charles R. Erdman reported to him that the ranch had a value of about $25,000. No other investigation was made by petitioners prior to February 1939 as to the financial condition of the Schaefers. None of the notes were ever renewed and nothing was paid on the advances, except $200 paid by Emily at some undisclosed time. In February 1939, while visiting in California, the petitioners *307 learned from Mrs. Wright, a married daughter of Clara M. Schaefer, that the Schaefers were about to lose the ranch through foreclosure proceedings. The petitioners immediately went to Arizona and learned that Clara M. Schaefer was dead, that Emily Schaefer had practically lost her mind, that the Schaefers were hopelessly insolvent and that there were three first mortgages outstanding against the ranch, all of which had priority over the security given to them. Katherine Schaefer had denied that the loans were made. The first mortgages outstanding against the ranch were foreclosed in 1939. Thereafter, the petitioners, at the request of Mrs. Wright, who was not involved in the loan transactions, acquired the ranch from the former holders of first mortgages for its full value of about $24,000 as a place for Mrs. Wright and Katherine Schaefer to live, and since then they have lived on the ranch, Mrs. Wright being the manager of the property for the petitioners. Opinion There is considerable evidence in the record to indicate that these loans of petitioners, claimed as deductions in 1939, were in the nature of gifts. The recipients of the money were old friends of the petitioners, *308 and as early as about 1900, members of a church of which Charles R. Erdman was the minister. The petitioners testified that they felt very sorry for them and also felt somewhat responsible for their welfare. There is an abundance of evidence to reflect such feelings of the petitioners. The payments of petitioner were 18 in number and extended over a period of 19 years, commencing in 1911. The six advances made by Charles R. Erdman did not commence until a year later, but continued until 1938. During this period no demands were made for payment, nothing was paid on the advances, except $200 at some time not shown by the record, and no investigations were made to ascertain the financial standing of the Schaefers other than one in 1917 as to the value of the ranch. Promises were made at undisclosed times to pay when the ranch was sold and petitioners testified that they placed some reliance on such promises. Mortgages, subject to prior mortgages, were received in 1926 from Clara Schaefer to secure two loans aggregating $1,938.40 made in that year by petitioner, and in 1930 and 1932 Katherine Schaefer gave petitioners warranty deeds to part of the ranch, subject to outstanding mortgages. *309 Thus the petitioners were given notice in 1926 and again in 1932 that prior mortgages were outstanding against the ranch. Such notice of other debts of the Schaefers secured by mortgages on the ranch did not alter the policy of petitioners to make further payments to the debtors. None of the notes received to evidence the payments ran for longer than three years, yet it does not appear that any of them were renewed or that requests were made for renewals. The indifference of petitioners over a long period of time to the question of repayment of their advances is evidence of the fact that they did not expect the amounts to be repaid or intend that they should be reimbursed. We do not know the date of death of Clara M. Schaefer, except that it occurred on or prior to February 1939, or whether she left an estate; hence, so far as the record shows, the loans to Clara M. Schaefer might have been canceled by operation of law prior to 1939, either before her death or in connection with her estate. Any ordinary statute of limitations had run on substantially all of the loans and there is no indication of record that the debtors would not have pleaded it as a bar in any suit instituted *310 for collection of the debts. The evidence does show on this point that Katherine Schaefer denied at some undisclosed time that the loans were made. Under such circumstances the petitioners must show substantial reason why thereafter the debts had value. Duffin v. Lucas, 55 Fed. (2d) 786, certeriorari denied, 287 U.S. 611. In any event, we are unable to find from the evidence that the loans had any value on January 1, 1939. It follows that the respondent did not err in disallowing the deductions. Reorganization of Blackwood Coal & Coke Co. Findings of Fact By the terms of an agreement executed or September 23, 1935, petitioner and others sold 122 1/2 shares of stock of the Lattimer Foundry & Machine Co., and 21 shares of stock of Pardee Bros. & Co., Inc., and received therefor cash, notes, and an account as follows, petitioner's interest in the assets acquired by her being as indicated: Petitioner's
Received
interest
Cash
$ 17,000.00
$ 2,112.68
Notes of The C. Pardee
Works
35,011.02
3,689.67
Notes of Blackwood Coal
& Coke Co.
307,987.08)
Open account against
)
33,160.38
Blackwood Coal &
Coke Co.
2,937.67
*311 The Blackwood Coal & Coke Co. was at that time and had been since April 18, 1933, in receivership. In her income tax return for 1935, the petitioner claimed a loss on the Lattimer Foundry & Machine Co. stock by reporting the cash $2,112.68 as the total amount realized. The sale of stock of Pardee Bros. & Co. was not reported in the return. On October 3, 1940, Ario Pardee, acting for the petitioner and others, purchased for $2,500 a note in the amount of $396,488.52 held by the C. Pardee Works, a corporation, and executed by the Blackwood Coal & Coke Co. The cost basis of petitioner's interest in the claim was $137.36. On October 22, 1941, Ario Pardee, president of the Blackwood Coal & Coke Co., filed a plan of reorganization of the corporation with the District Court for the Western District of Virginia. The petition recites that the corporation had been under the operation of a receiver since April 1933; that the operating losses of the receiver had averaged about $100,000 a year, and that efforts had been made without success to obtain necessary new working capital for that corporation. The plan of reorganization submitted to the court provided, in part, that any creditor might *312 become a party to the plan of reorganization; that the corporation's leases of coal lands would be canceled and new ones entered into by the land owners with T. A. Gibson; that the corporation would lease its mining equipment to Gibson on a royalty basis; that the claims of general creditors of the corporation as of April 18, 1933, were $1,818,329.49, of which $1,743,433.57 was held by members of the Pardee family, which included petitioner, and corporations owned or controlled by them; that the stockholders of the Blackwood Coal & Coke Co. would surrender their stock to the corporation; that the capitalization of the corporation would be changed from 8,000 shares, par value $100 a share, to 300,000 shares, each of a par value of $1; that the corporation would be authorized to issue 20-year non-interest bearing notes not in excess of $500,000; that general creditors other than members of the Pardee family and corporations owned or controlled by them would receive in full satisfaction of their claims, an aggregate amount equal to the royalty payments received under the lease of equipment during the first year, less $1,800 for one-half of the salary of an engineer; that the Pardee family *313 and corporations owned or controlled by its members would receive in full settlement of their claims, non-interest bearing notes, maturing in 20 years in the principal amount of 25 per cent of the face amount of their claims and new stock for the remainder on the basis of one share of stock for each $5 of their claims; and that a suit pending in court for damages in the amount of $60,000 would be settled by certain royalty payments payable under the new coal lease. The president of the Blackwood Coal & Coke Co. informed creditors of the corporation on October 8, 1941, that the corporation would realize from $40,000 to $60,000 a year as rental for its coal mining equipment. The plan of reorganization was approved by the court on October 22, 1941, and its decree was made final on October 31, 1941. The stockholders surrendered their stock as of December 31, 1941, and, pursuant to the plan of reorganization, the members of the Pardee family and corporations owned or controlled by them received as of December 31, 1941, in settlement of their claims aggregating $1,739,270.02, including the notes and open account, totaling $310,924.75 and note for $396,488.52, against the Blackwood Coal *314 & Coke Co., notes of the face amount and common stock of a par value totaling $695,707.50. During 1942 other creditors, in accordance with the plan of reorganization, received $46,083.46, or 61.53 per cent of their claims of $74,895.92 and at the close of 1942, the remainder of $28,812.46 of their claims, less $368.12 for expenses of the trustee, was credited to the corporation's surplus. An unsecured non-interest bearing note for $77,731.18, dated December 10, 1942, and maturing on or before November 1, 1961, and a certificate for 46,638 shares of stock was received for the notes and open account, aggregating $310,924.75. Petitioner's interest in the note and stock certificate was $8,290.09 and 4,975 shares, respectively. A like note for $99,122.13 and a stock certificate of 59,473 shares of stock was received for the note in the amount of $396,488.52. Petitioner's interest on the note and stock certificate was $5,446.27 and 3,268 shares, respectively. The notes issued by the Blackwood Coal & Coke Co. on the exchanges were transferable only on the books of the corporation. The balance sheet included by the Blackwood Coal & Coke Co. in its amended tax return for 1942 disclosed a *315 book deficit surplus of $905,287.51 at the beginning of 1942, and a book surplus of $766,153.36 at the close of the year. The income tax returns of the petitioner for 1935, 1940, and 1941 were filed on the cash basis. Opinion By an amended answer, the respondent proposes to tax petitioner in 1941 on a gain of $4,280.99 realized from the exchange of notes of, and an open account against, the Blackwood Coal & Coke Co., in which she had a face value interest of $33,160.38, for notes and new stock of the corporation pursuant to the plan of reorganization, and a gain of of $2,675.05 on the other note exchanged in the transaction for like property. The contention of respondent upon the brief is that there was no continuity of the interest in the old stockholders of the corporation after completion of the transactions and consequently there was no reorganization within the meaning of the statute. The petitioner argues that there was a recapitalization of the corporation under section 112 (g) (1) (E) of the Code and a non-taxable exchange under section 112 (b) (3). [1]
*316 As part of the plan of reorganization approved by the court the capital structure of the corporation was reduced from 8,000 shares, par value $100 a share, to 300,000 shares, each of a par value of $1. The readjustment of the capital of the corporation for a business purpose constituted a recapitalization, unless prevented for reasons to be discussed. Millicent Turle Roelker, 39 B.T.A. 967; Edith M. Greenwood, 41 B.T.A. 664; The Hoagland Corp., 42 B.T.A. 13; Adam A. Adams, 4 T.C. 1186; United Gas Improvement Co. v. Commissioner, 142 Fed. (2d) 216. It is now well settled that there can not be a reorganization under any of the provisions of section 112, without continuation of a proprietary interest in the transferee corporation. The rule was first announced by the Supreme Court in Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, and has been followed by that Court in subsequent cases. LeTulle v. Scofield, 308 U.S. 415; Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179; *317 Helvering v. Southwest Consol. Corp., 315 U.S. 194. The plan of reorganization here provided for the surrender by stockholders of all of their stock of the corporation. Minority creditors, with one exception, holding about 4 per centum of the aggregate amount of claims against the corporation, were to receive under the plan of reorganization an aggregate amount equal to the royalty payments received for a specified period under a lease of equipment of the corporation; and the majority creditors, which included petitioner, were to receive notes of the corporation, maturing in 20 years, for 25 per cent of the face amount of their claims and stock of the corporation for the remainder. The old stockholders, if they did participate in the reorganization (beyond surrendering their stock) did not do so qua stockholders. Their rights ceased and passed to creditors in the receivership proceedings. When the plan for reorganization was filed, providing that the old stockholders would surrender their stock, and the plan was approved by the court, the equity in the old company passed to the creditors. Helvering v. Cement Investors, Inc., 316 U.S. 527; Bunker Hill & Sullivan Mining, etc., Co., 1 T.C. 1057 (1076). *318 The issuance to the majority creditors of new stock in part payment of their claims satisfied the continuity requirements of the statute. Helvering v. Alabama Asphaltic Limestone Co., supra, in which all creditors did not receive like treatment under the plan of reorganization. Helvering v. Southwest Consol. Corp., supra, involved different facts and is not decisive of the question here. In our opinion, there was reorganization in 1941. The respondent contends that, assuming a statutory reorganization took place, the exchange made by petitioner does not fall within any of the provisions of section 112 (b). His only argument against the contentions of petitioner that the exchange is within the provisions of section 112 (b) (3), supra, is that there was no continuity of interest in the old stockholders. The effect of such argument is that no reorganization occurred, a question already decided against him. We agree with respondent that in addition to a statutory reorganization the exchange must be within one of the provisions of section 112 (b) to escape recognition of gain or loss, but we find there was such exchange. The exchange here falls within *319 section 112 (b) (3), supra. The petitioner, in exchange for an open account and notes, received notes maturing in 20 years and new stock. The maturity dates of the old notes were not shown, but this failure of proof on the part of respondent may not be used to base a holding that the obligations were shortterm notes and, therefore, not securities within the meaning of the statute. The notes and stock received in the exchange are clearly securities under the statute. Daniel H. Burnham, 33 B.T.A. 147; affd., 86 Fed. (2d) 776; Commissioner v. Freund, 98 Fed. (2d) 201; Edith M. Greenwood, 41 B.T.A. 664; Commissioner v. Neustadt's Trust, 131 Fed. (2d) 528; Commissioner v. Kolb, 100 Fed. (2d) 920; Globe-news Publishing Co., 3 T.C. 1199. The fact that an ordinary debt due from the reorganized corporation formed part of the consideration for the exchange does not take the exchange here out of section 112 (b) (3). The Hoagland Corporation, 42 B.T.A. 13; The United Gas Improvement Co., 47 B.T.A. 715; affd., 142 Fed. (2d) 216. Accordingly, this issue *320 is decided in favor of the petitioner. Decision will be entered under Rule 50 in Docket 4699, and decision will be entered for the respondent in Docket No. 4700. Footnotes
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b) Exchanges Solely in Kind. - * * *
(3) Stock for stock on reorganization. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.↩